## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**") is made as of December 27, 2013, by and among **Wen-Kev East 125, LLC**, a New Jersey limited liability company ("**125 Tenant**"), **Wen-Kev Bayonne, Inc.**, a New Jersey corporation ("**Bayonne Tenant**"), **Wen-Kev, Inc.**, a New Jersey corporation ("**165 Tenant**"), **Wen-Kev Jersey City One, Inc.**, a New Jersey corporation ("**Jersey City 1 Subtenant**"), **Wen-Kev Jersey City Two, Inc.**, a New Jersey corporation ("**Jersey City 2 Tenant**"), **Wen-Kev Matawan, Inc.**, a New Jersey corporation ("**Matawan Tenant**"), **Wen-Kev Third Avenue LLC**, a New Jersey limited liability company ("**Third Avenue Tenant**"), **Wen-Kev Tinton Falls, Inc.**, a New Jersey corporation ("**Tinton Tenant**") (125 Tenant, Bayonne Tenant, 165 Tenant, Jersey City 1 Subtenant, Jersey City 2 Tenant, Matawan Tenant, Third Avenue Tenant and Tinton Tenant are referred to collectively as "**Seller**"), the Estate of Kevin Rasquinha, by its personal representative, Keith Rasquinha (the "**Estate**"), and **Wenesco Restaurant Systems, LLC** a New Jersey limited liability company, or a company to be formed by it ("**Purchaser**"), (Seller, Purchaser and the Estate are herein each a Party and together, the "**Parties**").

A. Seller operates the eight (8) "Wendy's" or "Wendy's Old Fashioned Hamburgers" restaurants located as listed on **Exhibit A** (Each individually a "**Restaurant**" and collectively, the "**Restaurants**").

B. The Restaurants are currently controlled by the Estate of Kevin Rasquinha through its personal representative, Keith Rasquinha (the "**Representative**").

C. Seller is the owner of a leasehold interest in the real estate, building and related improvements (collectively, the "**Property**") used in the operation of each of the Restaurants, each lease as listed on **Exhibit A-1** is a "**Lease**" and collectively the "**Leases**".

D. The Parties hereto desire that Seller transfer, assign and sell to Purchaser, and Purchaser acquire and purchase from Seller, all of Seller's right, title and interest in and to the assets used exclusively in the operation of the Restaurants, and that the Estate   transfer, assign and convey to Purchaser, and Purchaser acquire from the Estate, all of the Estate's Wendy's franchise rights for the Restaurants, upon the terms and conditions set forth herein.

E. Seller is in a Chapter 11 bankruptcy proceeding that was filed in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") under the caption "Wen-Kev Management, Inc. et. al., Debtors Case No. 13-36463-RG" (the "**Bankruptcy Case**"); and

F. The transactions contemplated by this Agreement will be consummated pursuant to the Auction and Sales Procedures Order and the Sale Approval Order (as such terms are defined in Article 12 of this Agreement) to be entered in the Bankruptcy Case under Sections 363 and 365 and other applicable provisions of the United States Bankruptcy Code, and the transactions and this Agreement are subject to the approval of the Bankruptcy Court.

G. In connection with the purchase of the assets described herein, and subject to Bankruptcy Court approval upon notice to interested parties, at the Closing Seller and Purchaser shall enter into Lease Assignment and Assumption Agreements (collectively, "**Lease Assignment Agreements**") in substantially the form attached hereto as **Exhibit E-1**, pursuant to which Seller shall assume and assign to Purchaser the Property used in the operation of the

Restaurants and the Lease for each Restaurant, in each case upon the terms and subject to the conditions set forth herein and therein.

H. At the Closing, Purchaser and the Estate will execute and deliver the Franchise Documents (as defined in Section 2.02 below) with Wendy's International, Inc. to effectuate the transfer of the Restaurants.

Now, therefore, in consideration of the covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

## TRANSFER OF ASSETS AND LIABILITIES

1.01    Assets to be Transferred.  On the terms and subject to the conditions of this Agreement, at the Closing Seller shall sell, convey, assign and transfer to Purchaser (or to another entity designated by Purchaser) all of Seller's right, title and interest in and to the following properties and assets used exclusively in connection with the Restaurants (collectively, the "**Assets**") free and clear of all liens, claims and encumbrances to the maximum extent permitted by Section 363 of the Bankruptcy Code (as more particularly described in Section 1.05), except for (a) liens for taxes or other governmental charges or levies that are not yet due or payable, (b) statutory liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen and other liens imposed by law for amounts not yet due, (c) liens incurred or deposits made to a governmental authority in connection with a permit, (the liens in clauses (a) through (c), inclusive, collectively, the "**Permitted Liens**"):

(a)    all of the furniture, trade fixtures and equipment owned or leased by Seller and located at a Restaurant as of the time hereof and the Closing Date (collectively, the "**Equipment**");

(b)    the contracts, agreements and commitments of Seller that remain in effect as of the Closing Date and that relate exclusively to the business conducted at a Restaurant (the "**Existing Contracts**"), including without limitation those listed in Schedule 1.01(b), to the extent that Purchaser elects, in its sole discretion, to require Seller to assume and assign to Purchaser at Closing, and Purchaser agrees to assume, such contracts, without Purchaser having any obligation to make any payments to cure any defaults or otherwise pay any amounts in connection with such assignment, together with any other contracts hereafter designated by Purchaser pursuant to Article 1.04 (collectively, the "**Assigned Contracts**");

(c)    the cash bank for each Restaurant to be at closing a minimum of $2,000.00 per Restaurant;

(d)    all security deposits being held by the landlords under the Leases;

(e)    the Inventory (as defined in Section 2.01 below) and all other inventories and supplies that are usable in the ordinary course of business and located in a Restaurant as of the Closing Date, including counters, shelving, racks, slat walls, display cases, décor, tables, seating, signs, promotional items and materials, new and unused uniforms, small wares and office supplies; and

(f)    the proceeds of any insurance policy payable for a claim arising out of the loss or reduction in value of any of the Assets (collectively, the "**Personal Property**").

2

On the terms and subject to the conditions of this Agreement, at the Closing the Estate will transfer, assign and convey to Purchaser, and Purchaser will acquire from the Estate, all of the Estate's Wendy's franchise rights for the Restaurants (the "**Estate's Franchise Rights**"), upon the terms and conditions set forth herein.

1.02    Retained Assets.  Notwithstanding anything in this Agreement to the contrary, the Assets to be transferred and assigned by Seller to Purchaser hereunder shall exclude (i) any receivables related to the operations of the Restaurants prior to the Closing Date, (ii) any deposits related to utility services unless transferable to Purchaser and adjusted as part of the Closing, (iii) any insurance policies, including all of Seller's rights in and to unearned premiums, refunds, and all claims or possible claims under such policies for the period prior to the Closing, (iv) the letter of credit currently being held in connection with the Restaurant located at 2121-2123 Third Avenue, New York, New York, will be released to Seller and replaced by Purchaser, and (v) any records (provided that Purchaser may request copies of records in Seller's possession or control that are related to the Restaurants and that are permitted to be provided to Purchaser under applicable law).

1.03    Liabilities to be Assumed.    On the terms and subject to conditions of this Agreement, in partial consideration of the sale, transfer, conveyance and assignment to Purchaser of the Assets, as of the Closing Date, Purchaser shall assume the following debts, liabilities and obligations of Seller (collectively, the "**Assumed Liabilities**"):

(a)    all taxes, assessments and other liabilities of Seller for which Purchaser receives a credit pursuant to Section 2.03;

(b)    the obligations and liabilities of Seller under the Assigned Contracts that accrue or arise from and after the Closing Date; and

(c)    the CCF obligations contained in Section 5.07 (b).

Except for the above listed items (a) and (b), Purchaser shall not be liable for any debts, liabilities or obligations of Seller that occurred or accrued prior to the Closing Date (the "**Retained Liabilities**").  In no event shall Seller be liable for any debts, liabilities or obligations of Purchaser arising out of or incurred in connection with the operation of the Restaurants or the ownership of the Assets from and after the Closing Date.

1.04    Assumed and Assigned Contracts.  Seller agrees it will (i) simultaneously with the filing of the necessary pleadings seeking authorization of the Auction Sale, file the necessary pleadings seeking authorization for it to assign one or more (as Purchaser may elect) of the those contracts set forth on Schedule 1.01(b), and (ii) promptly after receiving a written request by Purchaser, which must be made within 30 days after the Closing Date, file the necessary pleadings seeking authorization for it to assume and assign such additional Existing Contracts specified by Purchaser in its request to Seller.

1.05    No Liens.  The Assets shall be sold pursuant to, and to the fullest extent permitted by, 11 U.S.C. § 363(f) and all other applicable laws free and clear of any and all of the following (collectively, "**Liens**"): liens, security interests, encumbrances and claims (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5)), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, recoupment, rights of recovery, judgments, orders and decrees of any court or foreign or

domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "**Liens and Claims**"), with any Liens and Claims to attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Assets before the Closing Date.  As a result of the Liens and Claims being transferred to the proceeds of sale, the parties holding secured claims shall not have rights to credit bid at the Auction Sale (as defined below in Article 12) as would be authorized under 11 U.S.C. § 363(k) or as might otherwise be authorized by any applicable law.

    1.06    Consideration. On the terms and subject to conditions of this Agreement, and in consideration of the sale, transfer, conveyance and assignment of the Assets and the Estate's Franchise Rights, at the Closing, Purchaser shall pay to Seller the following amounts: Seven Million Seven Hundred Thousand and NO/100 Dollars ($7,700,000.00) (the "**Closing Amount**") for the Assets including the Inventory, and the Estate's Franchise Rights. The Closing Amount, as adjusted in accordance with this Agreement shall constitute the "**Purchase Price.**"   The Closing Amount shall be paid to Seller by Purchaser as follows: (a) within five (5) business days after this Agreement is fully executed, Purchaser shall deposit Seven Hundred Seventy Thousand and NO/100 Dollars ($770,000.00) (the "**Deposit**") by check or wire to the Trust Account of Spector & Ehrenworth, P.C., as escrow agent ("**Escrow Agent**"), in escrow to be held in a non-interest bearing federally insured account, and (b) the remainder of the Purchase Price in cash at the Closing. The Purchase Price for the Assets shall be allocated as by Thomas Colitsis, C.P.A. prior to Closing.  Purchaser and Seller agree to use the allocation for federal and state income tax purposes and to cooperate in the preparation and timely filing of IRS Form 8594 reflecting the allocation. Following the Closing, in the event that any adjustment is made which would require a revision to the allocation of the Purchase Price, the applicable parties will use good faith efforts to agree to a revised allocation and then amend the applicable portion of the allocation.  To the extent that, after the Closing, either Seller or Purchaser shall receive payments from any third parties relating to business operations at a Restaurant and attributable to the period prior to (in the case of receipt by Purchaser) or after (in the case of receipt by Seller) the Closing Date, the party receiving the same shall promptly make delivery thereof to the applicable party entitled to such payment.

    1.07    Closing.  Subject to the satisfaction or waiver of all the conditions set forth in Articles VII and VIII hereof, the closing of the transactions contemplated in this Agreement (the "**Closing**") shall be effective as of and shall take place within five (5) business days after the entry, by no later than March 1, 2014, of a Sale Approval Order (as defined in Article 12), which as of such Closing has not been stayed, vacated or reversed, to be held at such place and time, or by such other means, as the Parties shall agree.  The date on which the Closing occurs is herein referred to as the "**Closing Date**". Purchaser shall be entitled to possession of the Assets and to begin operating the Restaurants as of 12:01 a.m. on the Closing Date (the "**Effective Time**").

1.08    Deliveries by Seller.   At the Closing, Seller will deliver the following to Purchaser:

(a)    the Lease Assignment Agreements, duly executed by Seller, for each Lease, including the consent of the landlord of said Property if such consent is required and a release of the Estate of Kevin Rasquinha, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

(b)    a Bill of Sale and Assignment and Assumption Agreement in the form attached hereto as **Exhibit B**, duly executed by Seller, with respect to the Assets and the Assigned Contracts (the **"Bill of Sale"**), which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

(c)    Franchise Documents, duly executed by the Estate, together with a written waiver duly executed by Wendy's, waiving any rights of first refusal it may have with respect to the Restaurants;

(d)    An assignment agreement, by which the Estate assigns to Purchaser the Estate's Franchise Rights (**"Franchise Rights Assignment"**), duly executed by the Estate, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

(e)    a duly executed certificate sufficient to satisfy the withholding and other requirements of Sections 1445 and 6045 of the Internal Revenue Code, and any other similar federal, state or local taxation requirements, to the extent applicable;

(f)    a duly executed closing statement in form and substance satisfactory to Seller and Purchaser;

(g)    a copy of the Sales Approval Order, which shall not have been stayed, vacated or reversed, and such other consents and resolutions as are required to consummate the transaction and allow the transfer with no liens on the Leases or Restaurants;

(h)    a landlord estoppel certificate for each Lease or Bankruptcy Court order allowing assumption and assignment of each Lease subject to no liens or other money due; and

(i)    all such other documents, agreements, instruments, writings and certificates as Purchaser may reasonably request and that are necessary for Purchaser to satisfy any of its obligations hereunder.

1.09    Deliveries by Purchaser.  At the Closing, Purchaser will deliver the following to Seller:

(a)    the Closing Amount, in accordance with Article 12 by wire transfer of immediately available funds in accordance with written instructions provided by Seller prior to the Closing;

(b)    the Lease Assignment Agreements, duly executed by Purchaser, for each Lease, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

(c)    Franchise Documents, duly executed by Purchaser, together with a written waiver duly executed by Wendy's, waiving any rights of first refusal it may have with respect to the Restaurants and approval of Purchaser as a franchisee to operate the Restaurants;

(d)    Wendy's written consent to the assignment by the Estate of the Estate's Franchise Rights to Purchaser;

(e)    a resale certificate(s) in form and substance reasonably satisfactory to Purchaser regarding the Inventory;

(f)    a duly executed closing statement in form and substance satisfactory to Seller and Purchaser; and

(g)    all such other documents, agreements, instruments, writings and certificates as Seller may reasonably request and that are necessary for Seller to satisfy any of its obligations hereunder.

## ARTICLE II

## RELATED MATTERS

2.01    Physical Inventory and Cash. The night before the date on which the Closing Date occurs, representatives of Seller and Purchaser (the "**Representatives**") shall count all food, paper, and kids' meal premiums at the Restaurant (the "**Inventory**") and the representatives shall complete and sign Purchaser's standard inventory form.  The Inventory will be valued at Seller's actual invoice cost and shall be credited to Seller at Closing.  The Representatives shall also count the cash bank on hand at each Restaurant and provide a credit to Seller at Closing for the amount of the cash bank on hand at each Restaurant, but not to exceed $2,500 per Restaurant. The cash bank on hand at each Restaurant shall be at least $2,000 but no more than $2,500.

2.02    Franchise Documents.  Prior to Closing (a) Purchaser will submit to Wendy's International, Inc. ("**Wendy's**") a duly executed Acknowledgment of Receipt of the current Wendy's International, Inc. Franchise Disclosure Document and (b) Purchaser will endeavor to obtain a waiver of Wendy's rights of first refusal for the Restaurants and Wendy's approval of Purchaser's application for franchise rights, and the assignment by the Estate of its Wendy's franchise rights for the Restaurants to Purchaser (collectively, the "**Franchise Documents**").

2.03    Apportionments.

(a)    On the Closing Date and as of the Closing Date, Purchaser and Seller shall apportion the following obligations and expenses in respect of the Restaurants (subject to subsequent adjustment pursuant to paragraph (b) of this Section 2.03):

(i)    the ad valorem taxes, assessments and fees (collectively, the "**Real Property Taxes**") for the Restaurants on such tax year or fiscal year basis or other period, as the case may be, as such Real Property Taxes may be levied or assessed, estimated on the basis of the last available tax bill such that Seller pays all Real Property Taxes attributable to the period through the day before the Closing Date and Purchaser pays for all Real Property Taxes attributable to the period commencing on the Closing Date and thereafter;

(ii)    if arrangements cannot be made for separate billing, any apportionable utility charges and any other charges which are properly apportionable in accordance with the terms of this Agreement;

(iii)    prepayments under the Assigned Contracts assumed by Purchaser and any other prepayments exclusively related to the Restaurants;

6

(iv)  a proportionate adjustment of the rent, common area charges, taxes, utilities, fees, percentage rent and all other items payable under the leases in effect at the Property (the "**Rent**") such that Seller pays all Rent attributable to the period prior to the Closing Date and Purchaser pays all Rent attributable to the period commencing on the Closing Date.

(v)  any adjustments pursuant to Section 3.12 of this Agreement; and

(vi)  personal property taxes, if any; and

(vii) Royalties, National Advertising, Co-op Marketing and any other fee or obligation due by Seller to Wendy's through the Closing Date shall be paid by Seller to Wendy's.

(b)  Seller and Purchaser agree to make payments to each other on a timely basis with respect to adjustments not correctly ascertainable on the Closing Date when the correct amount of any amounts to be adjusted or apportioned pursuant to this Section 2.03 are ascertained.

2.04  Cash and Cash Equivalents.  On the Closing Date, Seller shall remove all cash from each Restaurant, other than the cash banks described in Section 2.01 above. With respect to any coupons issued at the Restaurants prior to the Closing Date, Purchaser shall honor all such coupons presented for payment at the Restaurants. If Purchaser wishes to offer gift cards at the Restaurants, Purchaser will contract separately with the provider of such service.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser the following, as of the date of this Agreement and as of the Closing Date:

3.01  Corporate Organization.  Each of the companies other than the Third Avenue Tenant comprising Seller, is a corporation duly incorporated in the State of New Jersey and in good standing under the laws of the State of New Jersey and if the Restaurant operated by such company is in New York then, additionally qualified and in good standing in the State of New York.  Third Avenue Tenant and 125 Avenue Tenant are limited liability companies formed under the laws of, and in good standing in, the State of New Jersey authorized to do business in the State of New York.

3.02  Authority.  Each Seller has full power and authority, in accordance with its Articles of Incorporation or Certificate of Formation and other organizational documents to carry on its business in connection with the Restaurants as it is now being conducted, and to enter into and perform its obligations under this Agreement and the agreements, documents and instruments contemplated hereby and to carry out the transactions contemplated hereby and thereby and Seller's actions hereunder and thereunder have been duly authorized by the board of directors of or managing member, as appropriate, from each of the Seller entities. All corporate action on the part of Seller necessary for the authorization, execution and delivery of this Agreement and the agreements, documents and instruments contemplated hereby and the performance of all obligations of Seller hereunder and thereunder has been duly taken.

3.03  Validity.  This Agreement has been, and the other agreements, documents and instruments contemplated hereby to which Seller is a party when executed and delivered by each

7

of the Seller will be, duly executed and delivered by each of the Seller and constitute the legal, valid and binding obligations of Seller enforceable in accordance with their respective terms.

3.04    No Defaults.  Except as set forth in Schedule 3.04, neither the execution and delivery of this Agreement or the agreements, documents and instruments contemplated hereby nor the consummation of the transactions contemplated hereby and thereby will violate any provision of the Articles of Incorporation or Certificate of Formation or any other organizational document of Seller, or violate, or conflict with, or constitute a default (or constitute an event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, license, agreement, lease or other instrument or obligation to which Seller is a party or by which it or any of the Assets may be bound, or violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority applicable to either Seller or any of the Assets.

3.05    Title to Assets.  As of the date hereof and as of the Closing Date, Seller has and will have good and valid title to the Assets and at the Closing, Seller will convey to Purchaser the Assets free and clear of all liens and encumbrances except for Permitted Liens.

3.06    Contracts and Leases.  Each Assigned Contract, including, but not limited to, each and every franchise agreement with Wendy's and agreement associated with the Estate's Franchise Rights, and each and every lease of real estate, is a valid and subsisting agreement, without any default of Seller thereunder that will not be cured from the Closing proceeds, and assignable to Purchaser, without any default on the part of any other party thereto. No event or occurrence has transpired which, with the passage of time or giving of notice or both will constitute a material default under any Assigned Contract. At the time of the Closing, Seller shall have made all payments, cured all defaults, and performed all obligations due through the Closing Date under each Assigned Contract.

3.07    Permits.  Seller has all Permits (as defined hereafter) as are necessary to operate the Restaurants. All such Permits are valid and in full force and effect. Seller is not the subject of any pending or threatened action seeking revocation, suspension, termination or material modification or impairment of any such Permits. "**Permits**" shall mean all rights of Seller under any license, certificate of occupancy, public assembly permit, permit or approval from any government and regulatory authority which relates exclusively to the Assets or the operation of the Restaurants. Seller will deliver the Certificate of Occupancy for each Restaurant to Purchaser prior to the Closing. Within 10 days after the date of this Agreement, Seller will deliver copies and a list of all Permits for each Restaurant. In the event that any required Permit, including, without limitation, the assembly permit is not in Seller's possession or needs to be renewed or obtained, it shall be Seller's responsibility at Seller's cost and expense, to obtain such Permit prior to Closing.

3.08    Compliance with Applicable Law.  As of the date hereof Seller has received no written notices or communications (a) that it is not in compliance with all laws, regulations and orders applicable to the business conducted at the Restaurants, including, but not limited to, those relating to zoning, health, safety, and employment, or (b) that the present operation of the Restaurants violates any such laws, regulations or orders in any respect. Seller is in compliance in all material respects with all laws, rules and regulations applicable to Seller's operation of the Restaurants or ownership of use of the Assets.

8

3.09    Litigation.  Except as may be set forth in Schedule 3.09, as of the date hereof, Seller is neither engaged in nor threatened with, any legal action or other proceeding which, if adversely determined, would have a material adverse effect on the business being conducted at the Restaurants.  Except as may be set forth in Schedule 3.09, there are no actions, suits, claims, complaints, or proceedings pending or at the date hereof, threatened against, by or affecting the Restaurants in any court or before any arbitrator or governmental agency, domestic or foreign, which are not covered by insurance or as to which an insurer has reserved any right to deny coverage.

3.10    Brokers and Finders.  Neither Seller nor any of its respective officers, directors or employees has taken any action with respect to any broker or finder which would give rise to any liability on the part of Purchaser or incurred any liability for any brokerage fees, commissions or finder's fees in connection with the transactions contemplated by this Agreement which would give rise to any liability on the part of Purchaser.

3.11    Leases.  Each of the leases being assigned is a valid and subsisting agreement, no default of Seller's obligations thereunder exists that will not be cured at Closing, no material default exists on the part of the landlord under each lease except as listed on Schedule 3.04 which default will be cured prior to or at Closing, and upon assignment of the lease, Purchaser shall acquire a valid leasehold interest in the subject premises.  No event or occurrence has transpired which, with the passage of time or giving of notice or both will constitute a default under any lease at the time of the Closing; Seller shall have made all payments and performed all obligations due under and in connection with each such lease through the Closing Date. At or prior to Closing, Seller will deliver an estoppel certificate from each landlord under the leases stating that the lease and any amendments thereto are the complete documents, the lease is in full force and effect, the amount of monthly rent payable, the commencement and termination date of the lease and a statement that no defaults on the part of landlord or tenant exist, or will provide a court order to that effect.

3.12    Working Condition. All essential equipment and systems which are part of the Restaurants will be in good working condition and the physical plant will be in good working condition. Purchaser and Seller will walk-through each of the Restaurants and note any repairs which must be made at a time that is mutually convenient to the Parties, but in no event more than twenty (20) business days after execution of this Agreement. Any repairs noted shall be made by Seller prior to Closing. Purchaser or Seller may elect, at its option, to receive an adjustment at Closing instead of having Seller make the necessary repairs.

3.13    Consents and Approvals.  Except for the approval and authorization of the Bankruptcy Court, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required by Seller in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

3.14    Disclosure.  To the knowledge of Seller, prior to the execution and delivery of this Agreement Seller disclosed and provided to Buyer all information and documents material to the liabilities and condition of the Assets; all information disclosed by Seller to Buyer pursuant to this Agreement is true, correct and complete; and nothing in this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary in order to make Seller's

statements, representations, warranties, covenants and information contained in this Agreement not misleading.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller the following, as of the date of this Agreement and as of the Closing Date:

4.01    Corporate Organization.  Purchaser is a New Jersey limited liability company validly existing and in good standing under the laws of the State of its organization, and prior to and at the Closing, will be duly qualified and authorized to do business in the State of New Jersey and State of New York.

4.02    Authority.  Purchaser has full power and authority to carry out its business as presently conducted, to enter into and perform its obligations under this Agreement and the agreements, documents and instruments contemplated hereby and to carry out the transactions contemplated hereby and thereby and Purchaser's actions hereunder have been duly authorized by the sole member of Purchaser.  All entity actions on the part of Purchaser necessary for the authorization, execution and delivery of this Agreement and the agreements, documents and instruments contemplated hereby and the performance of all obligations of Purchaser hereunder and thereunder have been duly taken.

4.03    Validity.  This Agreement has been, and the other agreements, documents and instruments contemplated hereby to which Purchaser is a party will be when executed and delivered by Purchaser, duly executed and delivered by Purchaser and constitute the legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms.

4.04    No Defaults.  The execution, delivery and performance at the Closing of this Agreement and the agreements, documents and instruments contemplated hereby by Purchaser will not (a) result in a breach of any of the terms or provisions of, or constitute a default under, Purchaser's organizational documents or any indenture or other agreement or instrument to which Purchaser is a party or by which Purchaser is bound, (b) constitute a default under any mortgage, deed of trust, or encumbrance to which Purchaser is a party, or (c) conflict with, or result in a breach of, any law, order, judgment, decree or regulation binding on Purchaser.

4.05    Brokers and Finders.  Neither Purchaser nor any representative or employee of Purchaser, has taken any action with respect to any broker or finder which would give rise to any liability on the part of Seller or incurred any liability for any brokerage fees, commissions or finder's fees in connection with the transactions contemplated by this Agreement or the agreements contemplated hereby which would give rise to any liability on the part of Seller.

4.06    Consents and Approvals.  Except for registrations and approvals required in order for Purchaser to conduct business at a Restaurant following the Closing, and the approval and authorization of the Bankruptcy Court, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required by Purchaser in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.  Purchaser holds (or at the Closing will hold) sales tax certificates of authority and other tax registration and certificates required to collect and remit sales tax in connection with the operation of the Restaurant.

4.07    Sufficiency of and Title to the Assets.  Upon consummation of the Transactions, Purchaser will acquire good and marketable title in and to each of the Assets, free and clear of all Liens to the maximum extent permitted by the Bankruptcy Code, other than Permitted Liens, as required in Article 1.05.

# ARTICLE V

## COVENANTS OF THE PARTIES

5.01    Transfer Fees.  All sales, ad valorem, transfer, recording, escrow, filing and similar taxes and fees (including any penalties or interest) incurred in connection with this Agreement and the transactions contemplated hereby (collectively, the "**Transfer Fees**") shall be borne 50% by Purchaser and 50% by Seller; provided, however, that any taxes imposed on the transfer of real property incurred in connection with the Leases shall be borne by Seller. Purchaser shall timely remit to the appropriate governmental agency or authority all Transfer Fees, including any sales or transfer tax that may be due at the Closing.  The Parties will use commercially reasonable efforts to assist each other in the filing of all necessary tax returns and other documentation with respect to all such Transfer Fees, and, if required by applicable law, will join in the execution of any such tax returns or other documentation.  If any Transfer Fees are based on the amount of the Purchase Price or the allocation of the Purchase Price as agreed pursuant to this Agreement and the Purchase Price or allocation thereof is adjusted after the Closing pursuant to the terms hereof, such Transfer Fees shall be recalculated using the adjusted amounts and Purchaser shall file any required amendments or other documents with the applicable governmental agency or authority and, if additional Transfer Fees are due, Purchaser shall timely remit such additional Transfer Fees to such agency or authority.  Promptly upon the remittance of any Transfer Fees to the applicable governmental agency or authority, Purchaser shall provide reasonable evidence to Seller that such Transfer Fees were properly and timely remitted.

5.02    Expenses.    Whether  or  not  the  transactions  contemplated  hereby  are consummated, and except as provided in Section 5.01 for Transfer Fees above, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs and expenses.

5.03    Notices.  Each Party hereto shall promptly inform the other Parties hereto in writing of the occurrence of any events or the existence of any circumstances, the effect of which would constitute a breach of any covenant or warranty in this Agreement, or which would result in any representation or warranty in this Agreement being or becoming untrue or misleading.

5.04    Utilities.  Seller shall make certain that gas and electrical utilities serving the Restaurants shall not be terminated by the suppliers thereof as of the Closing Date.  Seller and Purchaser shall notify those utility companies that service the Restaurants that Purchaser shall be responsible for the payment of any and all obligations incurred therefor from and after the Closing Date for the utilities, and shall, to the extent practicable, cause meters to be read as of the Closing Date.    Telephone service, if any, for the Restaurants shall be terminated or transferred to Purchaser's account by Purchaser, with Seller's assistance, as of the Closing Date. If Seller's agreement for long distance service is not transferable then, Purchaser shall make its own arrangements for long distance service following the Closing. If internet service capacity satisfies Purchaser's minimum requirements, Seller will transfer the service to Purchaser at Closing and have the account changed to Purchaser's name. If such internet service does not

meet Purchaser's minimum requirements, then Seller will allow the account to continue in Seller's name for up to the earlier of: (a) 60 days, or (b) the date Purchaser installs its own internet service.

5.05    Conduct of Business Pending the Closing.  Seller agrees that from the date hereof until the Closing, unless otherwise consented to by Purchaser in writing, Seller will carry on the business at the Restaurants in substantially the same manner as heretofore conducted and in the ordinary course of business and will not enter into any agreement or make any commitment relating to the business conducted in the Restaurants except (a) in the ordinary course of business and consistent with past practice and (b) which can be terminated on thirty (30) days' notice.

5.06    Computer/Cash Register Systems.  The application software (POS, MWS and TWS) and programs and wireless network software utilized in the point of sale system and manager's work station located in the Restaurants are licensed to Seller and at Closing will be assigned to Purchaser.  Seller will notify its processing agent of the change in ownership.  Purchaser will be responsible for making sure its processing agent can begin using the software as of the Closing.

5.07    Soft Drink Supply Arrangements.

(a)    Coca-Cola North America ("**CCF**"), a division of the Coca-Cola Company, or an affiliate thereof owns or may own the post-mix dispensing equipment located at the Restaurants.  The equipment includes the dispenser unit, bag in box pumps, racks, carbonators, regulators, lines and fittings.  At Purchaser's option and with Bankruptcy Court approval upon notice to all interested parties, Seller shall (a) assign its agreements with the Coca-Cola distributor to Purchaser at the Closing; or (b) terminate and/or reject its agreement with CCF and Purchaser will enter into its own agreements.

(b)    CCF or an affiliate thereof provided or may have provided the funding for the menu boards and combo menu boards (collectively the "**Menu Boards**") located at the Restaurants.  Any obligations or liabilities that arise from and after the Closing Date and that are owed from Seller to CCF related to the Menu Boards at the Restaurants, including any obligations for unearned or unamortized menu board amounts, shall be included in the Assumed Liabilities.  Promptly after the Closing (i) Purchaser and CCF shall execute appropriate documentation prepared by CCF to reflect such assumption by Purchaser and (ii) if Purchaser is not already a party to a marketing agreement with CCF, Purchaser shall enter into a beverage marketing agreement with CCF.

(c)    If the Closing occurs after such time as CCF has advanced to Seller its "Gallon Volume Advance" for 2014 (the "**GVA**"), then the GVA shall be prorated between Seller and Purchaser, with Seller being entitled to a credit for a portion of the GVA equal to the portion of the year 2014 through and including the Closing Date, and Purchaser being entitled to the balance of the GVA.

5.08    Insurance.  Prior to the Closing Date, Purchaser shall add each of the Restaurants to its existing insurance policy or policies in connection with the Restaurants.

5.09    Efforts to Complete Transaction.  After the date hereof until the Closing Date, subject to the terms and conditions of this Agreement, each Party shall use commercially reasonable efforts to take all actions and to do all things necessary or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including

satisfaction, but not waiver, of the Closing conditions set forth in Articles VII and VIII of this Agreement).

5.10    No Other Representations and Warranties.    Purchaser acknowledges and agrees that the representations and warranties made by Seller in Article III hereof are the exclusive representations and warranties made by Seller with respect to the Restaurants, the Assets and the Assumed Liabilities.  Purchaser acknowledges and agrees that Seller makes no representations or warranties whatsoever with respect to any estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

## ARTICLE VI

## EMPLOYEES

6.01    Termination of Employees.    At the Closing effective as of the Closing Date, Seller will terminate all Employees and shall be responsible for compliance with all applicable law for all Employees prior to the Closing Date. Seller will comply with the notice and other provisions of Worker Adjustment and Retraining Notification Act ("WARN") and the New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act (C.34:21-2) and New York's Mini-WARN (Labor Law § 860) (together, the "Mini-WARN Acts") and will hold Purchaser harmless from any and all liability under the WARN Act and Mini-WARN Acts. Seller shall be responsible for the employment-related obligations with respect to Employees prior to the Effective Time, including, without limitation, any severance, paid time-off, sick or vacation amounts due or granted by Seller to any Employees prior to the Closing Date as well as any amounts due to any Employees resulting from Seller's existing 401(k) or stock plans.

6.02    Hiring of Seller's Employees.    Prior to the Closing, Purchaser may offer employment, effective as of the Closing Date, to any or all employees of Seller's then employed at the Restaurants (collectively the "Hired Employees"), but shall not be required to hire any employee in particular the back office employees located at Jersey City 1, all such offers of employment to be pursuant to Purchaser's standard employment practices and policies. Purchaser shall be responsible for the employment-related obligations with respect to the Hired Employees as of the Closing Date, including, without limitation, compensation for services performed for Purchaser from and after the Closing Date (and related employment and withholding taxes), and workers' compensation benefits with respect to injuries or incidents occurring from and after the Closing Date.

## ARTICLE VII

## CONDITIONS TO OBLIGATIONS OF SELLER

Each and every obligation of Seller under this Agreement to be performed at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless waived in writing by Seller.

7.01    Representations and Warranties True.    The representations and warranties of Purchaser contained herein shall be true, complete and accurate in all material respects as of the date when made and at and as of the Closing Date as though such representations and warranties were made at and as of such date, except for changes expressly permitted or contemplated by the terms of this Agreement.

7.02    <u>Performance</u>.  Purchaser shall have performed, delivered and complied with all agreements, obligations and conditions required by this Agreement to be performed, delivered or complied with by Purchaser on or prior to the Closing Date.

7.03    <u>No Injunction, Etc</u>.  On the Closing Date, (a) there shall be no effective injunction, writ, preliminary restraining order or any order of any nature issued or threatened by a court or other governmental authority of competent jurisdiction directing that the transactions provided for herein or any of them not be consummated as so provided or imposing any conditions on the consummation of the transactions contemplated hereby, and (b) no action, suit or proceeding shall be pending before any such court or other governmental authority seeking such relief.

7.04    <u>Franchise Approval</u>.  Wendy's shall have granted to Purchaser the franchise rights to operate the Restaurants, and assigned the franchise agreements to Purchaser and Purchaser shall have satisfied all terms, conditions, and requirements pertaining to the granting of such franchise. Any franchise transfer fees Wendy's requires to be paid for the transfer shall be paid by Seller.

7.05    <u>Bankruptcy Court Approval</u>.

(a)    The Bankruptcy Court shall have entered the Sale Approval Order in the Bankruptcy Case, in form and substance reasonably satisfactory to Seller and Purchaser, authorizing the transactions and approving this Agreement under Sections 363 and 365 of the Bankruptcy Code and, as of the Closing Date, shall have entered an order authorizing and directing Seller to assign to Purchaser the Assigned Contracts and the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated or reversed.  The Sale Approval Order shall be in form and substance reasonably acceptable to Seller and shall (i) provide that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code, (ii) waive any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(h) or 6006(d), (iii) provide that the sale of the Assets shall be free and clear of all Liens, other than Permitted Liens, as required in Article 1.05, (iv) provide that the transactions contemplated hereby are approved and that Seller's execution, delivery and performance of the documents related thereto are approved; and (v) Purchaser is not a successor to Seller.

(b)    No injunction, stay or similar order or decree, issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the transactions contemplated by this Agreement.

7.06    <u>Closing Deliverables</u>.  Seller shall have received all of the deliverables described in Section 1.07 of this Agreement.

Seller may not rely on the failure of any condition set forth in this Article VII to be satisfied if such failure is caused by Seller's failure to act in good faith or Seller's failure to perform its obligations under this Agreement.

## ARTICLE VIII

## <u>CONDITIONS TO OBLIGATIONS OF PURCHASER</u>

Each and every obligation of Purchaser under this Agreement to be performed at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless waived in writing by Purchaser:

14

8.01    Representations and Warranties True.  The representations and warranties of Seller contained herein shall be true, complete and accurate in all material respects as of the date when made and at and as of the Closing Date as though such representations and warranties were made at and as of such date, except for changes expressly permitted or contemplated by the terms of this Agreement.

8.02    Performance.   Seller shall have performed, delivered and complied with all agreements, obligations and conditions required by this Agreement to be performed, delivered or complied with by it on or prior to the Closing Date, including, without limitation, consent of all landlords under the Leases, in form reasonably satisfactory to Purchaser.

8.03    Franchise Approval.  Wendy's shall have granted to Purchaser and assigned to Purchaser the franchise rights to operate the Restaurants, with only such conditions as are reasonably acceptable to Purchaser, including, without limitation, the extent of any obligation undertaken by Purchaser to pay franchise fees arising prior to the Closing.

8.04    Bankruptcy Court Approval.

(a)    The Bankruptcy Court shall have entered the Sale Approval Order in the Bankruptcy Case, in form and substance reasonably satisfactory to Seller and Purchaser, authorizing the transactions and approving this Agreement under Sections 363 and 365 of the Bankruptcy Code and, as of the Closing Date, shall have entered an order authorizing and directing Seller to assign to Purchaser the Assigned Contracts and the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated or reversed.  The Sale Approval Order shall be in form and substance reasonably acceptable to Seller and shall (i) provide that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code, (ii) waive any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(h) or 6006(d), (iii) provide that the sale of the Assets shall be free and clear of all Liens, other than Permitted Liens, (iv) provide that the transactions contemplated hereby are approved and that Seller's execution, delivery and performance of the documents related thereto are approved; and (v) Purchaser is not a successor to Seller.

(b)    No injunction, stay or similar order or decree, issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the transactions contemplated by this Agreement.

8.05    Closing Deliverables.   Purchaser shall have received all of the deliverables described in Section 1.08 of this Agreement

Purchaser may not rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure were caused by Purchaser's failure to act in good faith or Purchaser's failure to materially perform its obligations under this Agreement.

## ARTICLE IX

## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

9.01    Survival of Representations.    The representations and warranties made by Purchaser or Seller under this Agreement or pursuant hereto, shall survive the Closing only to the extent provided for in this Article IX.

9.02    Post-Closing Escrow.  The sum of $200,000.00 of the purchase price shall be held in escrow for a period of one (1) year subsequent to closing.  The purpose of the escrow is to

serve as a reserve to cover any losses or damages sustained by Purchaser by virtue of any material breach of any representations and/or warranties hereunder. Said escrow shall be held by Spector & Ehrenworth, P.C. Seller shall be promptly notified in writing of any claim to the escrow and the basis therefor. Upon such notification, Seller shall have a reasonable period of time to resolve or settle the claim. In the event Seller fails to do so, the escrowee shall be permitted to apply the escrow toward the satisfaction of said claim of said claim. In the event of a dispute between the parties, the dispute shall be first submitted to non-binding mediation and, if the parties fail to resolve the matter to their mutual satisfaction for any reason within thirty (30) days after a party first makes a written request for mediation, the dispute shall be then be submitted to binding arbitration before a single arbitrator under the commercial rules of the American Arbitration Association. Upon the expiration of one (1) year from closing, the remaining balance of the escrow shall be released to Seller. The escrow shall be maintained in an interest-bearing account by the escrowee, and all interest thereon shall inure to the benefit of the party ultimately entitled to the escrow.

9.03    Agreement of Seller to Indemnify. Subject to the terms and conditions of this Article IX, Seller hereby agrees to indemnify, defend and hold Purchaser, its affiliates and their respective directors, officers, shareholders, members, partners, employees, agents and representatives (collectively, the "**Purchaser Indemnified Parties**") harmless, at any time after consummation of the Closing, from and against all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses (collectively, "**Damages**") asserted against, resulting to, imposed upon or incurred by the Purchaser Indemnified Parties, by reason of or resulting from (a) the Retained Liabilities; (b) a breach by Seller of any of its representations or warranties contained in this Agreement; (c) a breach by Seller or the Estate of any of their respective covenants or agreements contained in this Agreement; and (d) the termination of employment by Seller of any Employees.

9.04    Agreement of Purchaser to Indemnify. Subject to the terms and conditions of this Article IX, Purchaser hereby agrees to indemnify, defend and hold harmless Seller, its affiliates and their respective directors, officers, shareholders, members, partners, employees, agents and representatives (collectively, the "**Seller Indemnified Parties**"), at any time after consummation of the Closing, from and against all Damages asserted against, resulting to, imposed upon or incurred by any Seller Indemnified Party, directly or indirectly, by reason of or resulting from (a) the Assumed Liabilities; (b) a breach by Purchaser of any representation or warranty of Purchaser contained in this Agreement; (c) a breach by Purchaser of any covenant or agreement of Purchaser contained in this Agreement; (d) the ownership or use or operation of the Assets or any Restaurant from and after the Effective Time; (e) the employment or termination of employment of any Hired Employees by Purchaser; or (f) payment of 50% of the Transfer Fees; provided that, with respect to this Section 9.03(f), the indemnity of Purchaser for any taxes imposed on the transfer of real property incurred in connection with the Leases shall be fifty percent (50%) of the aggregate amount of such taxes.

9.05    Procedures Relating to Indemnification. The obligations and liabilities of the party making the indemnity pursuant to Sections 9.02 and 9.03 hereof (the "**Indemnitor**") with respect to claims made by third parties against the party or parties being indemnified pursuant to such Sections (the "**Indemnitee**") shall be subject to the following terms and conditions:

(a)     The Indemnitee will give the Indemnitor prompt written notice of any such claim, and the Indemnitor shall have the right to undertake (at the Indemnitor's sole cost and expense) the defense thereof by representatives chosen by it and reasonably acceptable to the Indemnitee.

(b)     If the Indemnitor, within a reasonable time after notice of any such claim, fails to defend the Indemnitee against which such claim has been asserted, the Indemnitee will (upon further notice to the Indemnitor) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk of the Indemnitor, subject to the right of the Indemnitor to assume the defense of such claim at any time prior to settlement, compromise or final determination thereof.

(c)     Anything in this Section 9.04 to the contrary notwithstanding, (i) if there is a reasonable probability that a claim may materially and adversely affect the Indemnitee other than as a result of money damages or other money payments, the Indemnitee shall have the right, at its own cost and expense, to participate in the defense, compromise or settlement of such claim, and (ii) the Indemnitor shall not, without the written consent of the Indemnitee (which consent shall not be unreasonably conditioned, withheld or delayed), settle or compromise any claim or consent to the entry of any judgment.

(d)     In connection with all claims defended pursuant to this provision, the Indemnitee will give the Indemnitor prompt written notice of all material developments in connection with all claims, will promptly supply the Indemnitor with copies of all papers, documents and evidence in the Indemnitee's possession and such other information within the Indemnitee's knowledge pertinent to such claims, and will produce at the appropriate place or places, at reasonable times, such witnesses under the Indemnitee's control as may reasonably be requested by the Indemnitor or its representatives.

9.06    Exclusive Remedy.  If the Closing occurs, this Article IX sets forth the sole and exclusive remedy for any breach, inaccuracy, nonperformance or violation of this Agreement and, other than for the rights and remedies explicitly granted thereunder, any agreements, documents and instruments entered into in connection with this Agreement, regardless of whether a claim or counterclaim is based in tort, contract or any other legal theory, or arises under law or in equity, except for claims or counterclaims of, or causes of action arising from, fraud. In furtherance of the foregoing, each of the Parties hereby irrevocably waives, from and after the Closing, to the fullest extent permitted under applicable law, any and all rights, claims, counterclaims and causes of action (other than any claims or counterclaims of, or causes of action arising from, fraud) it may have against the other Parties arising under or based upon this Agreement or Bill of Sale or the transactions contemplated hereby or thereby, except (a) pursuant to the provisions of this Article IX and (b) any rights and remedies explicitly granted under the any agreements, documents and instruments entered into in connection with this Agreement.

## ARTICLE X

## TERMINATION

10.01   Methods of Termination.    This Agreement may be terminated prior to the Closing:

(a)      By mutual written agreement of the Parties; provided, however, if such written agreement is entered into subsequent to the entry of the Auction and Sales Procedures Order, termination pursuant to this Article 10.01(a) shall require approval of the Bankruptcy Court; or

(b)      By Purchaser or Seller, if the Closing has not occurred by March 27, 2014, TIME OF THE ESSENCE, provided the delay is not caused by the party terminating; or

(c)      By Purchaser in writing if Seller shall (i) fail to perform any of their respective covenants or agreements contained herein required to be performed by them prior to the date of such termination, or (ii) breach any of their respective representations or warranties contained herein or if any such representations or warranties become inaccurate, in each case, so as to cause a condition to the Closing to be incapable of satisfaction, which failure, breach or inaccuracy is not cured within thirty (30) days after Purchaser has notified Seller in writing of its intent to terminate this Agreement pursuant to this Section 10.01(c); or

(d)  · By Seller in writing if Purchaser shall (i) fail to perform any of its covenants or agreements contained herein required to be performed by it prior to the date of such termination, or (ii) breach any of its representations or warranties contained herein or if any such representations or warranties become inaccurate, in each case, so as to cause a condition to the Closing to be incapable of satisfaction, which failure, breach or inaccuracy is not cured within thirty (30) days after Seller has notified Purchaser in writing of its intent to terminate this Agreement pursuant to this Section 10.01(d);

(e)      By Purchaser if Wendy's fails, or indicates in writing its unwillingness, to (A) consent to the assignment by the Estate of the Estate's Franchise Rights to Purchaser, or (B) waive any rights of first refusal that it may have with respect to the Restaurants; or

(f)      By Purchaser if any Landlord fails, or indicates in writing its unwillingness to, consent to the assignment of any Lease; or

(g)      By Purchaser, if (i) the Bankruptcy Case is converted to a Chapter 7 proceeding, (ii) Seller files a plan of reorganization that does not provide for the consummation of the transactions contemplated hereby with Purchaser under the terms of this Agreement, (iii) the Bankruptcy Case is dismissed or a Chapter 11 trustee is appointed for the Seller or (iv) any event or omission shall have occurred which, either directly or indirectly, results in a material adverse effect on the value of the Assets.

(h)      By Purchaser if Purchaser is not the Highest Bidder as defined in Article XI.

10.02   Effect of Termination.  If Seller or Purchaser terminates this Agreement pursuant to Section 10.01, (a) this Agreement shall forthwith become null and void and of no further force and effect, (b) the transactions contemplated by this Agreement shall be abandoned without further action by any Party and (c) all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party and if terminated by Purchaser, Seller shall return the Deposit in full; provided, however, that (i) nothing in this Section 10.02 shall relieve any Party hereto from any liability with respect to any willful or intentional breach of this Agreement prior to such termination and (ii) the provisions of this Section 10.02 and Article XI (other than Section 11.12) shall survive the termination of this Agreement and shall remain in full force and effect; and provided further that if this Agreement is terminated because Wenesco Restaurant Systems, LLC is not the Highest Bidder, then notwithstanding the termination of this Agreement, Wenesco Restaurant Systems, LLC shall be entitled to receive,

18

and Seller shall be obligated to pay, the Breakup Fee in accordance with the terms of this Agreement.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.01  Amendment and Modification.  This Agreement may be amended, modified and supplemented only by written agreement of the Parties at any time prior to the Closing with respect to any of the terms contained herein.

11.02  Waivers.  No waiver shall be binding on a Party unless executed in writing by the Party making the waiver.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  The failure by any Party to enforce against another Party any term or provision of this Agreement shall not be deemed to be a waiver of such Party's right to enforce against the other Party by the same or any other such term or provision in the future.

11.03  Notices.  All notices, requests, demands and other communications required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given upon (a) actual delivery, if delivered by personal delivery, or (b) one (1) day after deposit with an overnight courier service for next day delivery, with service prepaid or (c) actual delivery if transmitted by facsimile during normal business hours (8:00 a.m.-5:00 p.m.) for the recipient, provided, however, that the same notice is also deposited on the same day with an overnight courier for next day delivery, with service prepaid:

**If to Purchaser, to:**

> Wenesco Restaurant Systems, LLC
> 333 Sylvan Avenue
> Suite 107
> Englewood Cliffs, New Jersey  07632
> Attn: Mr. Leon Magnes

With a copy to:

> Bleakley Platt & Schmidt, LLP
> One North Lexington Avenue
> White Plains, N.Y. 10601
> Attention: Robert Braumuller

> and

> Spector & Ehrenworth, P.C.
> 30 Columbia Turnpike, Suite 202
> Florham Park, New Jersey 07932
> bspector@selawfirm.com
> Attn: Brian D. Spector, Esq.

or to such other person or address as Purchaser shall furnish to Seller and the Estate in writing:

**If to Seller, to**:

> c/o Michael S. Kopelman, Esq.
> 55 Main Street
> Hackensack, NJ 07601

or to such person or address as Seller shall furnish to Purchaser and the Estate in writing.

If to the Estate, to:

> Keith Rasquinha
> 2-30 Garfield Avenue
> Jersey City, NJ 07305

or to such person or address as the Estate shall furnish to Purchaser and Seller in writing.

11.04  Assignment.  This Agreement, and all of the provisions hereof, shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party may assign this Agreement or any of its rights hereunder or delegate any of its obligations hereunder without the prior written consent of the other Parties; provided that, Purchaser may, without the consent of Seller assign this Agreement or any of its rights hereunder to any entity affiliated with Purchaser and under common ownership and control. Any unpermitted attempt or purported assignment or delegation without such prior written consent shall be deemed void.

11.05  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY REGARDLESS OF THE CONFLICTS OF LAW PRINCIPLES THEREOF. THIS MATTER IS PRESENTLY BEFORE THE PROBATE COURT IN PASSAIC COUNTY, NEW JERSEY AND ALL MATTERS RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND HEARD IN PASSAIC COUNTY.

11.06  Jurisdiction.     Each Party to this Agreement hereby irrevocably and unconditionally: (i) submits itself and its property to the exclusive jurisdiction of any federal or state court sitting in the State of New Jersey in any action directly or indirectly arising out of or relating to this Agreement, the transactions contemplated by this Agreement, or the formation, breach, termination or validity of this Agreement and agrees that all claims in respect of any such action shall be heard and determined solely in such court; (ii) consents that any such action shall be brought in such courts and waives any objection that it may now or hereafter have to the venue or jurisdiction of any such action in such court or that such court is an inconvenient forum for the action and agrees not to assert, plead or claim the same; (iii) agrees that the final judgment of such court shall be enforceable in any court having jurisdiction over the relevant Party or any of its assets; (iv) agrees that service of process in any such action may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 11.03; and (vi) agrees that nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the applicable rules of procedure.

11.07  Waiver of Jury Trial.     EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT

ISSUES AND, THEREFORE, EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OR ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY HERETO UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY HERETO MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HERETO HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS OF THIS SECTION 11.07. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

11.08   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.09   Headings. The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

11.10   Entire Agreement. This Agreement sets forth the entire understanding among the Parties concerning the subject matter of this Agreement and incorporates all prior negotiations and understandings. There are no covenants, promises, agreements, conditions or understandings, either oral or written, among the Parties relating to the subject matter of this Agreement, other than those set forth herein. No representation or warranty has been made by or on behalf of any Party to this Agreement, or any officer, director, employee or agent thereof, to induce the other Parties to enter into this Agreement or to abide by or consummate any transactions contemplated by any terms of this Agreement, except representations and warranties, if any, expressly set forth herein. No alteration, amendment, change or addition to this Agreement shall be binding upon any Party unless in writing and signed by all the Parties. The submission of any unexecuted copy of this Agreement shall not constitute an offer to be legally bound by any provision of the document submitted, either currently or in the future; and no Party shall be bound by this Agreement until it is fully executed and delivered by all Parties.

11.11   Third Parties. Except as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or corporation other than the Parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

11.12   Further Assurances. Subject to the terms and conditions of this Agreement, at any time after the Closing, each Party shall take such further actions and execute such further documents as may be necessary or reasonably requested by another Party in order to effectuate the intent of this Agreement.

11.13  Schedules.    Any matter, information or item disclosed under any specific representation or warranty in a Schedule shall be deemed to have been disclosed for all purposes of this Agreement in response to every representation or warranty in this Agreement in respect of which the relevance of such disclosure is reasonably apparent.

11.14  Invalidity.    Any provision in this Agreement that is held to be illegal or unenforceable shall be ineffective to the extent of such illegality or unenforceability without invalidating the remaining provisions and any such illegal or unenforceable provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law.

## ARTICLE XII

## AUCTION AND SALE PROCEDURES

This Asset Purchase Agreement is conditioned upon approval of the Bankruptcy Court and, if so approved, shall be presented and shall constitute an opening bid at an auction sale of Seller's assets pursuant to sales procedures as approved by the Bankruptcy Court (the "Auction Sale"). Seller has filed or promptly will file with the Bankruptcy Court a motion (the "Sale Motion") seeking the Bankruptcy Court's approval of an order (the "Auction and Sales Procedures Order") approving this Agreement and providing, *inter alia*, for the following procedures relating to the submission and consideration of competing offers:

12.01  Sale Process.    The Auction Sale shall be an absolute auction subject only to confirmation by the Bankruptcy Court at the Final Hearing and entry by the Bankruptcy Court of an order (the "Sale Approval Order") that the Auction and Sales Procedures Order was followed and that an Acceptable Bidder was the Highest Bidder.

12.02  Time and Date of Auction.    The Auction sale shall take place at 12:00 Noon on a date no later than thirty (30) days after the date of the entry by the Bankruptcy Court of the Auction and Sales Procedure Order.

12.03  Location.    The Auction Sale shall take place at the Bankruptcy Court, located in the Martin Luther King, Jr. Federal Building, 50 Walnut Street, Newark, NJ, or such other place as may be ordered by the Bankruptcy Court.

12.04  Acceptable Bidder.

(a)    An "Acceptable Bidder" is a party who has provided all of the following to Seller on or before 5:00 p.m. of the fourteenth (14th) day following the date of the entry by the Bankruptcy Court of the Auction and Sales Procedure Order:

(i)    A bid (an "Acceptable Qualifying Bid") for all of the Assets on the same terms as set forth in this Agreement in an amount equal to the Acceptable Opening Bid plus a break-up fee in the amount of $200,000 (the "Breakup Fee") (If more than one Acceptable Qualifying Bid is received, then the first in time, determined by receipt of an Acceptable Bidder Deposit, shall be deemed the Opening Bid at the Auction Sale).

(ii)    A cash deposit in an amount equal to ten percent (10%) of the Acceptable Qualifying Bid (the "Acceptable Bidder Deposit"). Seller's attorney shall deposit said funds in a separate bank account maintained at Valley National Bank, which bank is FDIC insured and a bank that is approved as a designated depository in bankruptcy matters. Seller's attorney shall cause all deposits to be returned within two (2) business days following the

Auction Sale if said depositor is not the Highest Bidder. The deposit shall be returned by first-class mail to the address and entity which the Acceptable Bidder in writing has instructed the attorney for Seller to return the deposit. If an Acceptable Bidder desires that the deposit be returned by wire transfer, then said instructions for said wire transfer shall be provided to Seller's attorney upon submission of the deposit. Failure of the Acceptable Bidder to provide proper instructions for the return of deposit will authorize Seller's attorney to hold said deposit pending written instructions.

(iii)    An executed asset purchase agreement including terms that are substantially similar to, and no less favorable to Seller than, this Agreement and is a firm offer.

(iv)    Evidence establishing, to Seller's satisfaction, such prospective bidder's financial ability to consummate the sale in a timely manner if such bidder becomes the Highest Bidder at the Auction Sale, and the ability to provide to each lessor adequate assurance of future performance of each respective lease.

(v)    Evidence establishing, to Seller's satisfaction, that in connection with the transactions contemplated by this Agreement, Wendy's has pre-approved of such prospective Acceptable Bidder's application for franchise rights, consented to the assignment by the Estate of the Estate's Franchise Rights to such prospective Acceptable Bidder, and agreed, in connection therewith, to waive any rights of first refusal Wendy's may have with respect to the Restaurants.

(vi)    A signed confidentiality agreement approved by Seller.

(b)    Upon timely receipt by Seller of a signed bid and confidentiality agreement from a prospective Acceptable Bidder, Seller shall promptly provide to such person such financial information as Seller believes to be reasonably appropriate; provided, however, that such financial information shall expressly exclude proprietary information.

(c)    Seller shall promptly, and in no event no later than one business day after receipt of all of the documents and the deposit described in Article 12.04(a) above, provide Purchaser, the Unsecured Creditors' Committee, if one has been appointed, the United States Trustee, any secured creditor who has requested notification in writing (or their counsel if they have appeared through counsel), and any other bidder after such bidder has made a bid in accordance with this Article, the name of each Acceptable Bidder and a copy of its bid.

(d)    Seller shall promptly, but no later than three (3) business days after receipt of all of the documents and the deposit listed in Article 12.04(a) above, inform the prospective Acceptable Bidder whether Seller designates the prospective Acceptable Bidder as an Acceptable Bidder or takes the position, based upon evidence presented, that said party should not be so designated.

(e)    Purchaser shall be deemed to be an Acceptable Bidder based upon its execution of this Agreement.

12.05    Acceptable Opening Bid.  The Purchase Price offered by Purchaser in Article 1.06 of this Agreement is hereinafter referred to as the "Acceptable Opening Bid." The Acceptable Opening Bid shall be deemed to be made by Purchaser upon the terms and conditions set forth in this Agreement, and Purchaser shall be deemed to be an Acceptable Bidder.

12.06   Acceptable Upset Bids. At the Auction Sale, an Acceptable Upset Bid may be made by any Acceptable Bidder. The first Acceptable Upset Bid must be in an amount equal to or greater than $100,000 in excess of the highest Acceptable Qualifying Bid received by Seller. Thereafter, Acceptable Upset Bids must exceed the previous Acceptable Upset Bid by an amount equal to or greater than $50,000. An Acceptable Upset Bid must be a bid to purchase all of the Assets under the terms and conditions set forth in this Agreement as approved by the Bankruptcy Court. The ultimate highest bidder shall be referred to herein as the "Highest Bidder" and its bid the "Highest Upset Bid."

12.07   Acceptable Bidder Dispute Resolution. The Bankruptcy Court shall hold a hearing within five (5) calendar days in advance of the auction date to hear and resolve any dispute which may exist between a prospective Acceptable Bidder and Seller as to whether said prospective Acceptable Bidder should be designated an Acceptable Bidder. The Bankruptcy Court retains the jurisdiction to determine such other times and dates as it deems appropriate to hear any dispute relative to a prospective Acceptable Bidder, and said hearing may be held upon an emergency notice as deemed appropriate in the sole discretion of the Bankruptcy Court.

12.08   How to Make an Upset Bid.   A valid Acceptable Upset Bid may be made to the Seller's attorney only by a person who satisfies the conditions set forth in the Auction and Sales Procedures Order to qualify as an Acceptable Bidder.

12.09   Irrevocable Nature of Bids. The Acceptable Upset Bid made by the Highest Bidder shall remain open and be irrevocable through the Final Hearing and, if the Highest Bid is determined at such hearing to be approved as the final Acceptable Bid, the Highest Bid shall remain open and be irrevocable through the date of closing.

12.10   Finality of Auction Process. The Acceptable Upset Bid of the Highest Bidder is not subject to any upset bid after the close of the Auction Sale or at the Final Hearing.

12.11   Procedures if No Acceptable Upset Bid is Received. If no Acceptable Upset Bid is received, then the Acceptable Opening Bid by Purchaser shall be deemed the highest and best offer for the Assets and shall therefore be submitted for approval by the Court at the Final Hearing.

12.12   Highest Bidder Deposit. The Highest Bidder shall cause to be deposited with Seller an amount in addition to its Acceptable Bidder Deposit such that the total amount of such deposit is equal to ten percent (10%) of the Highest Bid (the "Highest Bidder Deposit"); provided, however, that if Purchaser makes the Highest Bid, it shall not be required to make the Highest Bidder Deposit. The Highest Bidder Deposit shall be submitted to and shall represent good funds on deposit with Seller on or before Noon of the first business day following the Auction Sale.

12.13   Court Hearings.

(a)   Initial Sale Hearing.   An initial sale hearing will be requested to be held by the Bankruptcy Court which will approve the sale of the Assets, the requested Auction procedures (including, without limitation, the Breakup Fee), deem Purchaser as an Acceptable Bidder, and deem Purchaser's bid as the Acceptable Opening Bid.

(b)   Final Hearing/Confirmation Hearing. A final hearing will be held three (3) business days after the Auction Sale or as soon thereafter as can be scheduled by the Bankruptcy Court. It shall be the purpose of said hearing to confirm that the procedures as set forth in the Auction and Sales Procedures Order have been followed by Seller and the Auction Sale conducted in accordance with the same, and to make such findings as are necessary to provide the purchaser with proper title

24

in accordance with the terms and conditions of this Agreement and the Sale Approval Order. This hearing shall hereinafter be referred to as the "Final Hearing."

12.14   Closing Date. The closing date shall be deemed to be the date upon which the consideration is paid and all closing documents are signed. This may take place immediately after the entry of the Sale Approval Order but must occur within fifteen (15) business days of the entry of the Sale Approval Order.

12.15   Failure of Highest Bidder to Close. If the Highest Bidder should fail to close on the Closing Date on the purchase of the Assets in accordance with the Highest Bid, and only in such event:

(a)   Unless such failure to close was due to the failure of one or more of the conditions set forth in Article VIII to be satisfied or waived, and such failure was not the result of the action or inaction of the Highest Bidder, the Highest Bidder Deposit shall be forfeited to Seller on account of damages suffered by Seller as a result of such failure by the Highest Bidder to close, without prejudice to Seller's ability to seek to recover additional damages from the Highest Bidder;

(b)   Seller shall hold a new Auction Sale (the "New Auction Sale") of the Assets upon three (3) business days' notice to all entities previously determined to be Acceptable Bidders at the time selected by Seller for the New Auction Sale;

(c)   An entity that was not previously determined to be an Acceptable Bidder shall not have the opportunity to become an Acceptable Bidder. Purchaser shall be deemed to be an Acceptable Bidder, without having to provide an Acceptable Bidder Deposit, for the New Auction Sale;

(d)   If a New Auction Sale is scheduled by Seller, all Acceptable Bidders that wish to participate in the New Auction Sale must make the Acceptable Bidder Deposit as provided in Article 12.04(a)(ii) of this Agreement no later than 4:00 p.m. of the business day immediately prior to the commencement of the New Auction Sale, and such deposit shall be subject to return as provided in Article 12.04(a)(ii), and if an Acceptable Bidder fails to timely make this Acceptable Bidder Deposit, such entity shall no longer be considered an Acceptable Bidder and shall be disqualified from participation in the New Auction Sale;

(e)   If a New Auction Sale is scheduled by Seller, the Highest Bidder from the Initial Auction Sale shall not be an Acceptable Bidder and shall be disqualified from participation in the New Auction Sale; and

(f)   If a New Auction Sale is scheduled by Seller and, if at the time scheduled for the New Auction Sale the sole Acceptable Bidder is Purchaser, then the New Auction Sale shall not be held and the Acceptable Opening Bid shall be deemed to be the only bid for the Assets and Seller shall request confirmation of the Acceptable Opening Bid in the Sale Approval Order.

12.16   Payment of Breakup Fee. If the Assets are sold to an Acceptable Bidder, other than Purchaser, for a price in excess of the Acceptable Opening Bid, then at the closing of such sale, Seller shall pay Purchaser the Breakup Fee in cash; provided, however, if Purchaser is the purchaser of the Assets at a price in excess of the Acceptable Opening Bid, then Purchaser shall receive a credit in the amount of the Breakup Fee with regard to the price paid by Purchaser at the closing of the sale of the Assets.

25

12.17  Absolute Sale.  The Auction Sale shall be an absolute sale and not subject to upset bid after the Auction Sale.  Cause exists to allow for the Bankruptcy Court, pursuant to Bankruptcy Rule 6004(h), to authorize Seller to close the sale of the Assets immediately upon entry of the Sale Approval Order.

12.18  Necessary Findings for Purchaser.  If Purchaser is the Highest Bidder, a sale conducted pursuant to the procedures set forth herein shall result in the Assets being sold to the Highest Bidder as a good-faith purchaser.  Purchaser shall acquire all rights as can be conveyed pursuant to 11 U.S.C. § 363 including, but not limited to, the rights of a good faith purchaser pursuant to 11 U.S.C. § 363(m), and a finding, based upon the sworn representation of the Highest Bidder that the bidding was not pursuant to any improper collusive bidding practices, which would not allow for the sale to be avoided for reasons which would include 11 U.S.C. § 363(n).

12.19  Dispute Resolution.  The Bankruptcy Court shall retain exclusive jurisdiction to resolve any disputes which may arise concerning the Auction Procedures or other issues relevant to Seller's sale of the Assets as outlined herein.

12.20  Business Judgment.  Seller may exercise its reasonable business judgment in conducting the Auction Sale and in allowing a reasonable time for bids by Acceptable Bidders once the Auction Sale has commenced; however, it is intended that once commenced, the Auction Sale shall proceed to its conclusion without being continued to a subsequent day, and Seller may determine in its business judgment when to close the Auction Sale, declare the Highest Bid, and preclude further bids.  Seller may exercise its reasonable business judgment to recommend to the Bankruptcy Court the Highest Bid.

12.21  Emergency Court Hearing with Notice and Hearing.  The Auction Procedures Order shall authorize the Bankruptcy Court to hold emergency hearings to resolve any disputes that may rise prior to the auction.  These emergency hearings would include, but not be limited to, any hearing as to whether a party should be designated as an Acceptable Bidder.  All such emergency hearings shall be held on Notice and Hearing as determined by the Bankruptcy Court to be necessary under the circumstances and may include limited notice and/or telephonic notice to the designated parties.  Where deemed necessary, the Auction and Sales Procedures Order shall allow for ex parte orders to be issued by the Bankruptcy Court to aid and assist in the consummation

## ARTICLE XIII

### ESCROW AGENT

13.  Escrow Agent and Deposit.

13.01  Promptly upon receipt, Escrow Agent shall place the Deposit in a segregated, federally insured, interest bearing escrow account in a financial institution in the State of New Jersey, and shall promptly advise Seller and Purchaser of the institution name, address and account number.  The party receiving any interest accruing on the Deposit shall pay all taxes with respect thereto.

13.02  If any of the Conditions or contingencies provided for in this Agreement has not been satisfied as provided under this Agreement, Purchaser or Seller (unless Purchaser waives same) may notify Escrow Agent and demand the release of the Deposit within ten (10) days after such notice.  Escrow Agent shall give written notice of such demand to the other party.  Upon receipt of written approval from the other party to release the Deposit, or if Escrow Agent does

not receive written objection to the proposed payment from the other party within ten (10) days after its receipt of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent receives such written objection within the aforesaid period, Escrow Agent shall continue to hold the Deposit until otherwise directed by mutual written instructions from the Parties or a final judgment of a court of competent jurisdiction.

13.03  If Closing does not occur for any reason, other than a failure to satisfy or waive any of the Conditions or contingencies in this Agreement, and either party makes written demand to Escrow Agent for release of the Deposit, Escrow Agent shall give written notice of such demand to the other party. Upon receipt of written approval from the other party to release the Deposit, or if the Escrow Agent does not receive written objection to the proposed payment from the other party within ten (10) days after its receipt of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent receives such written objection within the aforesaid period, or if for any other reason Escrow Agent shall elect in good faith not to make such payment, Escrow Agent shall continue to hold such amount until otherwise directed by mutual written instructions from the Parties or a final order or judgment of a court of competent jurisdiction.

13.04  At Closing, Escrow Agent shall release the Deposit to Seller.

## ARTICLE XIV

## LIQUIDATED DAMAGES

14.  Liquidated Damages, Remedies.

14.01  Default by Purchaser.  The parties agree that if Purchaser defaults under this Agreement the damages which Seller shall sustain as a result thereof will be difficult, if not impossible to ascertain.  The parties, therefore, agree that if Purchaser defaults under this Agreement beyond any available cure period, Seller shall be entitled as its exclusive remedy to (a) terminate this Agreement, in which event all obligations of the parties hereunder shall be deemed null and void, and (b) retain as liquidated damages, to recompense Seller in full, the Deposit and all interest earned thereon.

14.02  Default by Seller. The liability of Seller hereunder for failure to comply with the requirements of this Agreement or inability to comply despite Seller using its best efforts such that any of the Property is not or cannot delivered as required by the terms of this Agreement shall be limited to at Purchaser's election (a) a return of the Deposit to Purchaser with interest thereon and payment of the break-up fee, or (b) Purchaser's election to waive the condition, if it can be waived, that it is, if it is not required in order for Seller to convey, or (c) the right to seek specific performance of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be duly executed as of the date first above written.

**SELLER:**

**Wen-Kev East 125, LLC**

By:

Name: *Wen-Kev Management*

Title: *Temporary Administration*

**Wen-Kev Bayonne, Inc.**

By:

Name: *Wen Kev Management*

Title: *Temporary Administration*

**Wen-Kev, Inc.**

By:

Name: *Wen Kev Management*

Title: *Temporary Administration*

**Wen-Kev Jersey City One, Inc.**

By:

Name: *Wen Kev Management*

Title: *Temporary Administration*

**Wen-Kev Jersey City Two, Inc.**

By:

Name: *Wen-Kev Management*

Title: *Temporary Administration*

[Asset Purchase Agreement Signature Page One of Two]

**Wen-Kev Matawan, Inc.**

By: _____

Name: _____

Title: _____

**Wen-Kev Third Avenue LLC**

By: _____

Name: _____

Title: _____

**Wen-Kev Tinton Falls, Inc.**

By: _____

Name: _____

Title: _____

**The Estate of Kevin Rasquinha**

_____

By its personal representative, Keith Rasquinha


**PURCHASER:**

**Wenesco Restaurant Systems, LLC**

By: _____

Name: Leon Magnes

Title:   Chief Executive Officer


**ESCROW AGENT:**

**Spector & Ehrenworth, P.C.**

By: _____

Brian D. Spector, Esq., Shareholder


[Asset Purchase Agreement Signature Page Two of Two]

## EXHIBIT A
## RESTAURANTS

1. Wen-Kev Jersey City One, Inc.  30 Garfield, Jersey City, NJ 07305
2. Wen-Kev Jersey City Two, Inc.  Rt. 440 & Kellogg St. Jersey City NJ  07305
3. Wen-Kev Third Avenue LLC  2121-2123 Third Avenue, New York NY 10029
4. Wen-Kev, Inc.  3939 Broadway, New York, NY 10032
5. Wen-Kev Bayonne, Inc.  181 La Fonte Way, Bayonne, NJ 07002
6. Wen-Kev Tinton Falls, Inc.  600 Shrewsbury Ave., Tinton Falls, NJ  07724
7. Wen-Kev East 125, LLC  79 East 125th Street, New York, NY 10035
8. Wen-Kev Matawan, Inc.  388 Highway 35 Keyport, NJ    07735

**EXHIBIT A-1**

**DESCRIPTION OF LEASES**

1. Sub-Lease dated November 13, 1996, by and between Wen-Kev Jersey City One, Inc. and Levin Management Corp., with respect to the premises located at 30 Garfield Avenue, Jersey City, New Jersey.

2. Sub-Lease dated March 6, 1997, by and between Wen-Kev Jersey City Two, Inc. and LEVCO Management, Inc., with respect to the premises located at 401 Route 440, Jersey City, New Jersey.

3. Lease dated February 4, 2000, by and between Wen-Kev Third Avenue LLC and Helm Management, Inc., with respect to the premises located at 2121-2123 Third Avenue, New York, New York.

4. Lease dated January 1, 2010, by and between Wen-Kev, Inc. and Royal Charter Properties, Inc., with respect to the premises located at 3939 Broadway, New York, New York.

5. Lease dated July 16, 2002, by and between Wen-Kev Bayonne, Inc and South Cove Development, with respect to the premises located at 181 LeFante Way, Bayonne, New Jersey.

6. Lease dated December 1, 2006, by and between Wen-Kev Tinton Falls, Inc. and ARC CAFEHLD001, LLC, with respect to the premises located at 600 Shrewsbury Avenue, Tinton Falls, New Jersey.

7. Lease dated June 9, 2009, by and between Wen-Kev East 125, LLC and 77-79 E. 125th Street, LLC, with respect to the premises located at 79 East 125th Street, New York, New York.

8. Lease dated December 1, 2006, by and between Wen-Kev Matawan, Inc. and Mario and Maria Spalliero, with respect to the premises located at 388 State Highway #35, Cliffwood Beach (Aberdeen Township), New Jersey.

## EXHIBIT B

### BILL OF SALE

### BILL OF SALE AND ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS:

_____, a _____ having a business office at _____ (hereinafter the "Seller"), for and in consideration of _____ ($_____) Dollars and other consideration paid to Seller by _____, a _____ having a business office at _____ (hereinafter the "Purchaser"), pursuant to a certain Asset Purchase Agreement between the parties dated _____, 2013_ (the "Asset Purchase Agreement"), the receipt and sufficiency of which is hereby acknowledged, sells, transfers and assigns to Purchaser all of its right, title and interest in and to those assets of Seller identified in the Asset Purchase Agreement and any and all Exhibits thereto (the "Assets"),

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns, forever:

Seller hereby restates all of the representations, warranties and covenants contained in the Asset Purchase Agreement, and same shall be true and accurate as of the date hereof and shall survive the execution and delivery of this Bill of Sale.

Seller further warrants and represents that (i) it is the lawful owner of the Assets, (ii) it has the lawful right to sell the Assets to Purchaser, (iii) all necessary Seller [director][shareholder][partner][trustee][manager][member] approvals and/or consent have been granted and/or obtained for this transfer and (iv) the Assets are free and clear of all claims, liens and encumbrances.

Seller further covenants and agrees to warrant and defend this conveyance, transfer, sale and assignment and the title of Purchaser, its successors and assigns, against all claims and demands; and from time to time on and after the execution and delivery hereof, at Purchaser's request and without further consideration, to execute and deliver such other instruments of conveyance and transfer and/or take other such action as Purchaser reasonably requests to more effectively convey, transfer and vest in Purchaser, or to put Purchaser, or its successors and assigns, good and marketable title in and to, and possession of, all of the Assets conveyed, transferred, sold, assigned and delivered hereunder or intended to be.

IN WITNESS WHEREOF, the Seller has caused this Bill of Sale and Assignment to be signed by its proper company officer this ___ day of _____, 2014.


**ATTEST OR WITNESS:**     **SELLER:**


By: _____


**[Please attach acknowledgement**

## EXHIBIT E-1

## ASSIGNMENT AND ASSUMPTION AGREEMENT FORM

AGREEMENT made this ___ day of_____, 2014, among _____, a with a business office at _____ (hereafter "Assignor"), and WENESCO RESTAURANT SYSTEMS, LLC, a New Jersey limited liability company with a business office at _____ ("Assignee).

WHEREAS, Assignor is the tenant pursuant to a lease from _____ (the "Landlord") and Assignor, (together, the "Lease"); and

WHEREAS, Assignor possesses all right, title and interest in and to the Lease as tenant, and desires to sell, assign and transfer its entire right title and interest in and to the Lease to Assignee, and Assignee desires to accept said sale, assignment and transfer, upon the terms and conditions set forth herein; and

WHEREAS, so far as is known, Assignor and the Landlord have no claims or defenses one against the other by reason of said Lease.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein set forth and for other good and valuable consideration, the receipt of which is acknowledged, it is agreed as follows:

1. Assignment. Assignor hereby sells, assigns and transfers to Assignee any and all of Assignor's right, title and interest in and to the Lease.  The foregoing sale, assignment and transfer is made with the representation and warranty that Assignor is not in material breach of the Lease and, as of the date of this Assignment, shall be current on all rental and other charges due under the Lease.

2. Acceptance and Assumption.  Subject to the consent of Landlord and the closing of this Assignment, Assignee hereby accepts the foregoing sale, assignment and transfer and assumes the obligation to pay all rent and additional rent and to faithfully perform all other covenants, stipulations, agreements and obligations under the Lease accruing on and after the date of closing of the Transaction, or otherwise attributable to the period commencing on said date and continuing thereafter.

3. Indemnification.

a. Indemnification of Assignee.  Assignor hereby agrees to indemnify, defend and hold Assignee harmless, at any time after consummation of the Transaction, from and against all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including without limitation, interest, penalties and attorneys' fees and expenses (collectively, "Damages") asserted against, resulting to, imposed upon or incurred by Assignee, by reason of or resulting from (a) liabilities, obligations or claims (whether absolute, accrued, contingent or other) existing as of the Closing Date or relating to liabilities, obligations or claims arising prior to the Closing Date or arising out of facts or circumstances existing at or prior thereto, whether or not such liabilities or obligations were known at the time of the Closing, relating to or arising out of the Lease or the possession or use of the Premises by Assignor prior to the Closing of the Assignment; or (b) a breach of any representation, warranty or agreement herein or any spare facts or circumstances constituting such a breach.

b. Indemnification of Assignor. Assignee hereby agrees to indemnify, defend and hold Assignor harmless, at any time after consummation of the Assignment, from and against all Damages asserted against, resulting to, imposed upon incurred by Assignor, by reason of or resulting from (a) liabilities, obligations or claims (whether absolute, accrued, contingent or other) arising from and after the Closing Date relating to or arising out of the Lease or the possession or use of the Premises by Assignee pursuant to the Sublease; or (b) a breach of any representation, warranty or agreement herein or any facts or circumstances constituting such a breach.

4. Expenses. All taxes and other governmental charges and fees, including, without limitations, any and all transfer taxes, stamp taxes, sales taxes, recording fees, relating to the transaction evidenced by this Agreement shall be paid in accordance with the terms and conditions of the Asset Purchase Agreement.

5. Termination of Sublease. Upon the closing of the Transaction the parties will enter into a Termination of Sublease and Assignee may, at its option and expense, have recorded a Discharge of Notice of Sublease.

6. Miscellaneous

a. Amendment and Modification. This Agreement may be amended, modified and supplemented only by written agreement of the parties.

b. Waiver of Compliance. No failure or delay by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

c. Notices. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail with postage prepaid to the parties at their addresses set forth above.

d. Governing Law. This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to contracts made and to be performed in that state and any litigation or alternative dispute resolution shall be venued in New Jersey.

e. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

f. Headings. The headings of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

g. Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersede all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party hereto.

35

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and their respective corporate seals to be affixed hereto, all as of the day and year first above written.

ATTEST:                                          ASSIGNOR:


_____          By:_____


ATTEST:                                          ASSIGNEE:
                                                 WENESCO RESTAURANT SYSTEMS, LLC


_____          By:_____



STATE OF                    )
                            )  SS.
COUNTY OF _____          )

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, an officer    duly    authorized    to    take    acknowledgements,    personally    appeared _____ known to me to be the person described in and who executed the        foregoing        instrument        as        _____        of _____, and who acknowledged before me that he or she executed this instrument for the purposes stated therein and of his or her own free will.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, this ___ day of _____, 20__, in this State and County.


                                          _____
                                          Notary Public
                                          (Notary Seal)

My commission expires:

STATE OF NEW JERSEY  )
                          )  SS.
COUNTY OF MORRIS  )

      Before me, the undersigned, a Notary Public in and for the State and County aforesaid or an attorney at law of New Jersey, an officer duly authorized to take acknowledgements, personally appeared _____ known to me to be the person described in and who as _____ of Wenesco Restaurant Systems, LLC, a New Jersey limited liability company, executed the foregoing instrument on behalf of the company; and he acknowledged before me that he executed this instrument in the name of and on behalf of the company; that this act was done by authority of the company for the uses and purposes set forth in the instrument; and that the foregoing instrument is the free act and deed of the company.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, this ___ day of _____, 20___, in this State and County.

                                             _____
                                           Notary Public
                                           (Notary Seal)

My commission expires:

## SCHEDULE 1.01(b)

## ASSIGNED CONTRACTS

1.  The agreement(s), as referenced in Section 5.06 of this Agreement, between Seller and a third party, pursuant to which such third party licenses to Seller the application software (POS, MWS and TWS) and programs and wireless network software utilized in the point of sale system and manager's work station located in the Restaurants.

2.  The agreement(s), as referenced in Section 5.07(a) of this Agreement, between Seller and CCF or an affiliate thereof, relating to the post-mix dispensing equipment located at the Restaurants that is or may be owned by CCF or an affiliate thereof, including the dispenser unit, bag in box pumps, racks, carbonators, regulators, lines and fittings.

3.  The agreement(s), if any, between Seller and CCF or an affiliate thereof, with respect to the Menu Boards, as referenced in Section 5.07(b), located at the Restaurants.

## SCHEDULE 3.04

## <u>DEFAULTS</u>

None

**SCHEDULE 3.09**

**PENDING CLAIMS AND/OR LITIGATION**

1.      Wen-Kev Management, Inc. and Wen-Kev, Inc. are defendants in a lawsuit brought in the Supreme Court of the State of New York, County of New York, by plaintiff Esther Rios, in connection with injuries sustained by Esther Rios as a result of a fall she took in Wen-Kev, Inc.'s restaurant at 3939 Broadway, New York, New York, which she alleges were the result of the negligence of Wen-Kev Management, Inc. and Wen-Kev, Inc.  Royal Charter Properties, Inc., Wen-Kev, Inc.'s landlord at the subject restaurant, which is a defendant/third party plaintiff in the matter has filed a third party complaint against Wen-Kev, Inc., alleging that any damages to Esther Rios were a result of the negligence of Wen-Kev, Inc. and seeking to recover from Wen-Kev, Inc. any damages Royal Charter Properties, Inc. is required to pay to Esther Rios.