Wendy G. Marcari, Esq.
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-3747
wmarcari@ebglaw.com

*Counsel to Royal Charter Properties, Inc.*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) |
| | ) |
| WEN-KEV MANAGEMENT, INC., *et al.*, | ) Case No. 13-36463 (RG) |
| | ) Chapter 11 |
| Debtors. | ) Jointly Administered |
| | ) |

**OBJECTION OF ROYAL CHARTER PROPERTIES, INC. TO CURE AMOUNT SET FORTH IN DEBTORS'** *NOTICE TO LANDLORDS* **AND TO ASSOCIATED MOTION FOR ORDER UNDER SECTION 363 OF THE BANKRUPTCY CODE APPROVING SALE OF THE DEBTORS' ASSETS**

COMES NOW Royal Charter Properties, Inc. ("RCPI"; variously "Owner" or the "Landlord") and files its Objection (the "Objection") to Debtors' January 17, 2014 *Notice to Landlords*, and to the Debtors' associated *Motion For Orders Pursuant To Sections 105(A), 363, 365, And 1146 Of The Bankruptcy Code (A) Authorizing And Scheduling An Auction At Which Certain Of The Debtors Will Solicit Bids For The Sale Of Their Assets; (B) Approving Procedures For Submission Of Competing Bids; (C) Approving Breakup Fee Provision; (D) Scheduling A Hearing To Consider Approval Of Such Sale After Bidding Process Has Been Completed; (E) Approving The Form And Manner Of Notice Of Auction Procedures And Sale Hearing; (F) Authorizing The Opening Bid Amount In Favor Of Wenesco Restaurant Systems,*

*LLC; (G) Authorizing The Sale Of The Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Claims Of Interest And Transferring Such Claims To The Proceeds Of Sale; (H) Requiring The Landlords Of The Assets Being Sold To File Arrearage Claims With The Court By February 1, 2014 Or Be Barred From Asserting Such Claims, If Any, And Assuming And Assigning The Leases To The Highest Bidder; (I) Approving The Form Of The Asset Purchase Agreement; And (J) Granting Related Relief Including, If Necessary, A Hearing Under 11 U.S.C. § 506* (the "Sale Motion")[1] respectfully states as follows:

## I. BACKGROUND

**A.    The Wen-Kev Bankruptcy and Sale Motion; associated Notice to Landlords**

1.    Wen-Kev Management, Inc. and its debtor affiliates, including Wen-Kev, Inc., debtor in case No. 13-36469 ("Wen-Kev"; variously the "Debtor" or the "Tenant"), filed their voluntary chapter 11 petitions on December 4, 2013 (the "Petition Date"). The cases of these affiliated debtors (collectively, the "Debtors") are jointly administered under Case No. 13-36463, In re Wen-Kev Management, Inc.

2.    The Debtors filed the Sale Motion on December 31, 2013 [DE No. 35], seeking approval to sell substantially all of their assets free and clear of liens, claims, and encumbrances, as well as approval of certain related sale and bidding procedures. The Court entered an Order on January 14, 2014 [DE No. 49], approving bidding procedures.

3.    Paragraph 3 of the Court's January 14, 2014 Order directed that the Debtors serve a notice of proposed cure amounts (each a "Cure Amount") owed to the landlords for each of the

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Lease, the *Notice to Landlords* and in the *Sale Motion*, as the case may be.

2

various leases that will be assumed and assigned under the proposed Asset Purchase Agreement between the Debtors and the buyer. It also requires that, no later than 5:00 p.m. on February 1, 2014, any landlord disputing the proposed Cure Amount must file an objection to the Cure Amount and serve such objection on counsel for the Debtors, Michael S. Kopelman, Esquire, at Kopelaw@yahoo.com; counsel for Wendy's, Arthur J. Abramowitz, Esquire at aabramowitz@shermansilverstein.com and Jerrold N. Poslusny, Jr. jposlusny@shermansilverstein.com; and counsel for the Senior Lender, Scott Esterbrook, Esquire, at sesterbrook@reedsmith.com. The Notice to Landlords further states, in relevant part, that "Any landlord that does not timely file an objection shall (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such leases and the Debtors shall be entitled to rely upon the Cure Amount they proposed, and (b) be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder and/or the purchaser of the Assets or any other assignee."

4.    Thereupon, the Debtors sent a *Notice to Landlords* on January 17, 2014. Paragraph 6 thereof states:

> With respect to Debtors' Wendy's Restaurant at Broadway & W. 165 Street: 3939 Broadway, New York, NY 10032, the landlord is Royal Charter Properties, Inc. c/o Cushman & Wakefield, 435 East 70th Street, Suite 300, New York, NY 10021. The rent is current and the security deposit amount is $40,767.00.

5.    Cushman & Wakefield subsequently sent the notice to Wen-Kev's landlord, RCPI, and RCPI, in turn, provided it to undersigned counsel.

**B.    Original lease Agreement between Wen-Kev, Inc. and PSC; Guarantee thereof**

6.    Pre-petition, Presbyterian Systems Corporation ("PSC"), as Owner and the landlord, whose address is c/o Phipps House Services, Inc., 43 West 23rd Street, New York, New

3

FIRM:24571488v2

York 10010 (the "Original Landlord") and Wen-Kev, Inc., a New York corporation, with an address of 30 Garfield Avenue, Jersey City, NJ 07305, as "Tenant", entered into a store lease dated July 1, 1998, attached hereto as **Exhibit A** (the "Lease"). Under the Lease, as initially signed, PSC leased to Tenant the store premises and basement areas of the space known as 3935 Broadway, 3937 Broadway and 3939 Broadway, New York, New York, in the borough of Manhattan, for an initial term of approximately fourteen (14) years, expiring September 30, 2012.

7. Wen-Kev's obligations to PSC under the Lease were guaranteed by Messrs. Robert Wall and Kevin Rasquinha under a Lease Guaranty Agreement executed on March 30, 1999.

8. In connection with its entry into the Lease Guaranty Agreement, on March 30, 1999, the Tenant mistakenly executed a Surrender Declaration, attached as Attachment 1 to the Lease Guaranty Agreement. In this document, Wen-Kev stated that it (purportedly) surrendered the demises premises back to PSC at that time. However, this mistakenly executed declaration clearly was not then fully effective (and the putative surrender of the demised premises was not then tendered to, let alone accepted by, PSC) because Wen-Kev never took the additional steps contemplated by and required under paragraph 11 of the Lease Guaranty Agreement, namely, Wen-Kev never, on March 30 1999 or thereafter, surrendered back to PSC either the keys to the demised premises or full possession of the leased space, as vacant, let alone in the condition required by the Lease.

9. Consistent therewith, PSC and Wen-Kev performed from and after March 30, 1999 as if the Surrender Declaration attached to the Lease Guaranty Agreement was not yet fully

4

effective. Thus, Tenant continued to pay and PSC continued to accept rent due under the Lease from and after March 30, 1999.

C. **Transfer of PSC's interest in the demised property to RCPI, August, 2000**

10. PSC transferred its right, title and interest in the building in which the leased premises is located to RCPI, the present Landlord, by a deed recorded in the Office of the City Registrar of the City of New York on August 8, 2000, recorded in Reel 3142, page 1406, whereupon RCPI became the new Landlord of Tenant. See **Exhibit B**.

11. More specifically, 3939 Broadway is part of the building at 600 West 165th Street (Block 2137, Lot 190), one of the properties transferred by PSC to RCPI by the aforesaid deed.

D. **Lease Modification and Extension Agreement in January 2010; revised Lease Guaranty**

12. Before expiration of the original 14-year term of the lease, on September 30, 2012, RCPI, as Owner (and landlord) and Wen-Kev, as Tenant, executed a Lease Modification and Extension Agreement dated as of January 1, 2010 (the "Lease Modification"), attached as **Exhibit C**. As more fully set forth therein, among other things, by this modification the term of the Lease was extended to December 31, 2029 (see ¶1) and the base monthly and annual rentals payable by Tenant to Owner (aka Landlord) were changed (see ¶2).

13. Paragraph 3(F)(i) of the Lease Modification modified paragraph 44(a) of the Lease to state as follows:

> Prior to commencement of any Tenant alterations, installations, additions or improvements, Tenant at its expense shall submit detailed plans and specifications (prepared by an architect or engineer licensed to do business in the State of New York) relating to such Tenant's work to Owner for Owner's approval, which approval shall not be unreasonably withheld or delayed, except that

5

>Owner shall be entitled to withhold its consent in its sole discretion for (i) any Tenant's work of a structural nature, and any Tenant's work that affects building systems. *All plans and specifications must meet the requirements of all governmental agencies and authorities having jurisdiction.* As a condition of Owner's approval of any of Tenant's work, Tenant shall pay to Owner, *as additional rent*, the actual expenses incurred by Owner for the review of Tenant's plans specifications [sic] by any third party architects, engineers or other consultants.

>(emph. added).

14. Paragraph 3(F)(ii) of the Lease Modification modified paragraph 44(c) of the Lease to state as follows:

>No Tenant's work shall be made which shall: (i) violate the certificate of occupancy for the building (unless Tenant shall obtain an amended or new certificate of occupancy upon completion of Tenant's work), (ii) impair the structural soundness or diminish the value of or cause permanent damage or injury to the building, the demised premises or to the interests of other tenants, (iii) adversely affect any of the building's systems, including, without limitation, plumbing, electrical and heating systems, (iv) restrict Owner's access to any building systems or equipment, (v) change or affect the exterior appearance of the building (unless prior written approval thereof shall be given by Owner), or (vi) *create a dangerous or hazardous condition.* In addition, Tenant shall use its best efforts not to disturb any other tenants of the building or any neighboring building during the performance of Tenant's work.

>(emph. added).

15. Paragraph 3(I) of the Lease Modification modifies Article 50 of the Lease to state, in relevant part:

>(a) Notwithstanding any provision in this lease to the contrary, Tenant agrees that Tenant will not assign this lease or sublet all or a part of the demised premises on or before December 31, 2014 without Owner's prior written consent, which consent Owner may grant or withhold in its sole discretion. Any attempted assignment

6

or subletting by Tenant in violation of the foregoing shall be deemed null and void and a material default by Tenant under the lease.

16. Paragraph 4 of the Lease Modification, titled Repairs, states:

Tenant shall promptly, at its sole cost and expense, perform the repairs to the demised premises set forth on Exhibit A hereto and made a part hereof [listing 5 repairs, with item 1 being "*Replace Tenant's exhaust fan and associated duct work located on the northwest corner of the roof*"] to the reasonable satisfaction of Owner, which repairs shall be performed in a professional and workmanlike manner and completed no later than June 1, 2010.

(emph. added).

17. Paragraph 5 of the Lease Modification, titled New Awnings, states:

*On or before July 1, 2010, Tenant shall replace the exterior storefront awnings at its sole cost and expense*...Subject to the provisions of Article 55 of the Lease, the color and material of such awnings, and any working or designs thereon, shall be prescribed by Owner as part of its standard storefront package, in its sole discretion. Tenant shall assume full legal liability and responsibility for compliance with all applicable laws and regulations, including any license or permit requirements, in connection with such awnings and shall insure same.

(emph. added).

18. Under paragraph 6 of the Lease Modification, and as more fully set forth therein, Tenant agreed to make a comprehensive remodeling of the demised premises in 2010, and every ten (10) years thereafter.

19. Under a Lease Guaranty agreement dated March 23, 2010, attached as **Exhibit D**, Kevin Rasquinha became the sole Guarantor of the Lease, as amended by the Lease Modification. In this regard, the Surrender Declaration attached thereto as Attachment 1 was, this time (and properly so), NOT executed by Tenant.

**E.    Existing, Uncured, Tenant Lease Violations; Indemnities owed to Landlord**

1.  *Exhaust Fan, Duct Work and Awnings work not performed by Tenant*

20.    Notwithstanding the clear language of paragraphs 4 and 5 of the Lease Modification, and despite prior notice from Landlord to Tenant of these problems and its duties, Tenant has yet to make the necessary replacements to the exhaust fan and duct work required by paragraph 4 of the Lease Modification, nor has Tenant yet to replace the awnings, as required by paragraph 5 of the Lease Modification.

21.    Landlord hereby re-notices Tenant of these Lease violations. Landlord, as more fully set forth below, respectfully requests that the Court now order Tenant to promptly correct and cure these violations as a condition of the Court allowing the Lease to be assumed and assigned by Tenant.

2.  *Notice from NY Criminal Court of Tenant's Failure to Produce a Public Assembly Floor/Seating Plan and a Certificate of Operation*

22.    Section 28-117.1 of the New York City Administrative Code states that:

> Place of Assembly Certificate of Operation. It shall be unlawful to use or occupy any building or space as a place of assembly without a certificate of operation issued by the commissioner. An application for a certificate of operation shall be made to the department in such form and containing such information as the commissioner shall provide. The department shall inspect any place of assembly space prior to issue of a certificate of operation. The commissioner shall not issue a certificate of operation unless the department determines that the space conforms to the approved construction documents and to the provisions of this code [the Building Code] and that the certificate of occupancy authorizes such use. *A certificate of operation shall not be issued to a place of assembly providing seating or other moveable furniture unless the commissioner approves a plan conforming to this code and the rules of the department. Seating and other moveable furnishings shall be maintained at all times during occupancy in accordance*

> *with the approved plan.* Any amendment of such plan shall be subject to prior approval by the commissioner.
>
> (emph. added)

23. Section 28.117.1.1 of the New York City Administrative Code states, in relevant part:

> Contents of certificate of operation. The certificate of operation shall contain the place of assembly certificate number, the number of persons who may legally occupy the space and any other information the commissioner may determine. Such a certificate shall be framed and mounted in a location that is conspicuously visible to a person entering the space….

24. Paragraph 3 of the Lease states, in relevant part, that:

> [T]enant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all approvals, permits and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval and shall deliver promptly duplicates of all such permits, approvals, and certificates to Owner…..

25. Paragraph 6 of the Lease states, in relevant part:

> Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law….

26. Paragraph 48(c) of the Rider to the Lease requires the Tenant, within 5 days written notice from Landlord, to immediately discontinue any illegal use of the Premises, with failure to do so, after notice, being a Lease default.

27. Paragraph 64 of the Rider to the Lease, supplementing Article 19 of the Lease, states that Tenant:

9

> [a]grees and disbursements [sic] to reimburse Owner for all reasonable attorney's fees and expenses expended in connection with formal legal actions to either compel compliance by Tenant or to recover damages resulting from noncompliance. Such amounts shall be deemed additional rent and shall be paid within five (5) days from rendition of a bill to Tenant.

28. On October 11, 2013, the New York State Division of Corporations served a corrected notice on the New York Presbyterian Hospital, an affiliate of the Landlord, advising the hospital of criminal charges against it arising from failure of the on-site restaurant operated by Tenant at 3939 Broadway to have a posted Certificate of Operation on-site. The Tenant's failure to have a valid Certificate of Operation is rooted in the apparent failure of the Tenant to have an approved seating plan in place which conforms to the Building Code, such seating plan being a requirement before a Certificate of Operation issues, as noted above.

29. The October 11, 2013 notice to the hospital advises that an earlier notice dated August 12, 2013 was being re-issued by the Division of Corporations because of bar date code problems with the earlier notice, and lack of evidence by the Division of Corporations that the first notice to the hospital, of August 12, 2013, was ever received (in fact, the earlier notice was not received by the hospital or its affiliate, the Landlord).

30. The re-issued notice to the hospital advises it (not the Landlord) of a hearing set for October 8, 2013 in the Criminal Court of the City of New York (the "Criminal Court") to address the lack of a valid certificate of operation for the demised premises at 3939 Broadway (leased to the Tenant).

31. Unfortunately, by the time the original notice was reissued to the hospital on October 11, 2013, the hearing date of October 8, 2013 had already come and gone. Thus, in a

FIRM:24571488v2

notice dated October 8, 2013, the Criminal Court advised the hospital that it had already been convicted of the subject violations of the NYC Administrative Code and fined $5,000 (in absentia).

32.    The various notices referred to above, including from the NYC Criminal Court, are attached hereto as **Exhibit E**.

33.    The Landlord now states, as more fully set forth below, that Tenant, as part of its cure in connection with any assumption and assignment of the Lease, is required to reimburse this $5,000 fine, if the same is paid by the hospital.[2] Landlord further respectfully requests that the Court order Tenant to make such reimbursement, as one of the conditions of any assumption and assignment of the Lease. Landlord further requests, as noted below, that as part of the required cure the Court also require Tenant to also take immediate and appropriate action to gain approval of an appropriate seating plan for 3939 Broadway and receive a duly issued Certificate of Operation covering such space and to provide satisfactory proof thereof, acceptable to both Landlord and the Court, establishing that such Certificate of Operation has issued in proper form, as a condition of the Court approving the assumption and assignment of the Lease by the Tenant.

3.    *Indemnity Obligation for Slip and Fall Litigation against Tenant and Landlord*

34.    Paragraph 8 of the Lease states that:

> Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise, *nor for any injury or damage to persons or property resulting from any cause of whatsoever nature*, unless caused by or

---

[2] The hospital has filed a motion to vacate the default judgment, for lack of adequate notice and because it and the summons were both addressed to the wrong person.

11

FIRM:24571488v2

due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building or caused by operations in construction of any private, public or quasi public work. *Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorney's fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agent, contractors, employees, invitees or licensees, of any covenant or condition of this lease, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees.* Tenant's liability under this lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

(emph. added)

35.     Paragraph 43(d) of the Rider to the Lease, as modified by paragraph 3(e)(5) of the Modification Agreement, states:

> Except as otherwise expressly provided herein, Wendy's shall defend, indemnify and hold harmless Owner, Royal Charter Properties, Inc., New York Presbyterian Hospital and Presbyterian Systems Corporation from and against all calms [sic], liability, loss and expense, including reasonable costs collection expenses and attorneys fees and disbursements, to the extend [sic] arising because of the negligence, misconduct, or other fault of the indemnifying party, its agents or employees.

36.     On February 10, 2012, both Landlord and Tenant, along with many other defendants, including Wendy's International, Inc., were served with an Amended Summons and an associated Amended Verified Complaint filed by the plaintiff therein in the case styled as *Esther Rios v. Wen-Kev Management, Inc., et. al.*, filed in the Supreme Court of the State of New

York, County of New York, Index No. 112418/2011. Therein, the plaintiff, Ms. Rios, alleges that, solely as a result of the negligence, carelessness and recklessness of the defendants, Ms. Rios was caused to trip and fall and/or slip and fall on January 12, 2010 on ice, snow or water and other debris adjacent to the demised premises at 3939 Broadway, New York, New York, allegedly causing Ms. Rios severe personal injury, great physical pain and mental anguish, as more fully alleged therein. Ms. Rios claims unspecified damages against the defendants.

37. The aforesaid Rios litigation is still pending as of the date hereof.

38. To date, Landlord has expended $17,419.94 to its counsel, Platzer, Lucas & Pearl, LLP, in connection with defense of the Rios litigation, with further legal fees due and owing, both as of the date hereof and for legal services rendered by such firm as defense counsel after the date hereof.

39. As more fully set forth below, Landlord demands, as part of cure and adequate assurance of future performance, indemnity in respect of the Rios litgation for both any judgment and damages ultimately recovered by Ms. Rios therein and for the Landlord's cost of defending itself in this litigation, from both Tenant and any permitted assignee, whether that assignee be the buyer under the Asset Purchase Agreement or any other successful bidder who offers a higher or better bid which is accepted by the Debtors and approved by the Court, as a condition of the Court allowing the Lease to be assumed and assigned by the Debtor.

4.   *Misstatement of the Security Deposit; Allegation that Debtor is current on its rent*

40. The Cure Amount stated with respect to the Lease in the *Notice to Landlords* filed by the Debtors is $0, insofar as the Notice alleges that the Debtor is current on its obligations under the Lease.

13

FIRM:24571488v2

41. The *Notice to Landlords* further alleges that the security deposit presently held by Landlord is $40,767. In fact, the security deposit held by Landlord at the present time is a lesser sum, only $40,178.76 (three times monthly rent, in 2012). Moreover, the proper security to be held by the landlord under the lease, at 3 times monthly rent, is an even greater sum, $41,393.25 (three times monthly 2014 rent of $13,797.75; *see* ¶9 of the Lease Modification). Thus, the security deposit held is "short" by $1,214.49, and this shortfall must be cured by the Debtor, as one of the conditions of any assumption or assumption and assignment of the Lease.

F.    **Landlord's Objection to Debtor's Sale Motion**

42. Landlord, in addition and supplement to its objection to the proposed Cure Amount, further objects to the Sale Motion and to any associated assumption and assignment of the Debtor's rights under the Lease to the successful purchaser of the Debtors' assets absent full cure of the existing Lease violations and defaults set forth above and full indemnity for the Rios litigation from both the Debtor and the successful bidder for the Debtor's interest in the Lease, subject to the approval of this Court.

II.   **LANDLORD'S OBJECTIONS TO THE CURE AMOUNT, AND TO ASSUMPTION AND ASSIGNMENT OF THE LEASE, AND TO THE SALE MOTION**

A.    **Assumption and Assignment Objections**

43. To assume and assign the Lease, the Debtor must fully comply with § 365 of the Bankruptcy Code, including by curing all defaults under the Lease at the time of assumption, compensating Landlord for any pecuniary loss resulting from any defaults, and providing adequate assurance of future performance under the Lease. *See* 11 U.S.C.

FIRM:24571488v2

§ 365(b)(1)(A)-(C). Based on these requirements and incorporating all the allegations herein, both above and below, by reference, Landlord's objections to the Sale Motion are as follows:

1.  *Cure Amount*

44.    The proposed cure amount listed in the *Notice to Landords* is $0, as Tenant claims therein that it is current on all its Lease obligations owed to Landlord.

45.    For all the reasons stated herein, both those above and below, all incorporated by reference, Landlord objects to the Debtor's proposed cure amount for the Lease.

46.    Landlord reserves the right to supplement its statements herein of Landlord's damages to date and of the various actions needed by the Debtor to cure existing Lease violations and to provide adequate assurance to Landlord of future performance, for the amount of any costs, damages and claims that have either already accrued or will accrue before any assumption of the Lease is finally effectuated.

47.    As noted above, the Lease contains indemnity provisions stating that the Debtor must indemnify and hold the Landlord harmless for not only any adverse effects on the Landlord (and its affiliates) of the *Rios* litigation, and the various other matters aforesaid, but also any other claims, not yet known to the Landlord or the Debtor, which may have accrued but not yet been brought against Landlord or the demised premises from events occurring before the date hereof, arising from the Lease and/or Debtor's leasehold interest therein. Accordingly, Landlord further objects to the cure amount set forth in the *Notice to Landlords* to the extent the Debtor is requesting to be relieved from all liability post-assumption for such matters. The Debtor must continue to be liable for all actions that have already occurred or that may occur before

FIRM:24571488v2

assumption, including claims for actions that are not yet known by Landlord, the Debtor or any of its affiliated Debtors.

48. Landlord requests that the Debtor provide proof of insurance, by the Debtor and any proposed assignee, that will guarantee that the Debtor and any assignee thereof will meet their respective indemnity responsibilities to Landlord under the Lease and under applicable law.

49. Because the necessary cure amount may change between the date hereof and such time as the Debtors and the winning bidder at the auction decide, with finality, to assume and assign the Lease in connection with the proposed asset sale and the closing thereon, Landlord reserves its right to demand payment of the full cure amount thereof at the time of assumption.

2. *Adequate Assurance of Future Performance*

50. To assume a lease under § 365, the Debtor must provide adequate assurance that the assignee can perform under the lease after such assignment. *See 11 U.S.C. § 365(b)(1)(C), (f)(2)(B); In re Bygaph, Inc.,* 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("lessor must be given adequate assurance of future performance so that it will be protected from having to take on the burden of a tenant who may be likely to default on this lease obligations after the assumption and assignment have occurred."); *see also In re Jennifer Convertibles, Inc.* 447 B.R. 713, 719 (Bankr. S.D.N.Y. 2011) ("An executory contract may not be assumed if, in addition to curing certain defaults, a debtor cannot provide 'adequate assurance of future performance under such contract.' 11 U.S.C. § 365(b)(1)(C). To determine whether a debtor has provided adequate assurance, a court must look at the facts and circumstances of each case. *In re M. Fine Lumber Co., Inc.,* 383 B.R. 565, 572 (Bankr. E.D.N.Y.2008). A debtor need not prove that it 'will thrive

FIRM:24571488v2

and make a profit' but only that it appears that it will meet its obligations. *In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr.S.D.N.Y.1985). Adequate assurance is 'appropriate and necessary where the counter-party has reasonable grounds for insecurity with respect to the debtor's ability to fully perform its obligations under the contract.' *In re Metromedia Fiber Network, Inc.,* 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005), *aff'd, Abovnet, Inc. v. SBC Telecom, Inc.,* 2007 WL 636602 (S.D.N.Y. Feb. 27, 2007) (06-8269-CLB))." Here, Landlord is entitled to and must receive the full benefits which it bargained for under the Lease. *See In re Ionoshphere Clubs, Inc.,* 85 F.3d 992, 999 (2d Cir. 1996).

51.   At this time, Landlord has received inadequate information from the Debtors regarding the financial capacity and ability of the proposed stalking horse bidder, or of any other higher and better bidder who ultimately prevails at the upcoming auction, to continue to fulfill all its obligations to Landlord under the Lease.

52.   Lacking the needed information about the proposed assignee, Landlord objects to the assumption and assignment of the Lease for lack of adequate assurance of future performance.

53.   Among other things, the Debtors have not provided to Landlord adequate assurance that the ultimate high bidder at the auction will obtain the level of insurance required of the tenant under the Lease, to satisfy § 365(l) of the Bankruptcy Code (stating that if a lease is assigned under § 365, "the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.").

FIRM:24571488v2

54. The Landlord directs the attention of the Debtor, its affiliated Debtors, the proposed buyer under the Asset Purchase Agreement, and all other actual or potential third-person bidders, to the insurance requirements of the Tenant under the Lease, as more fully set forth therein.

55. Landlord also requests that any future notices regarding the Lease be sent to the undersigned counsel.

WHEREFORE, for the reasons set forth herein, the Landlord prays that the Court sustain this Objection and (i) require the Debtor and its affiliated Debtors to fully comply with § 365 of the Bankruptcy Code as more fully set forth herein, before allowing the Debtor to assume and assign the Lease, (ii) award Landlord appropriate cure amounts in respect of all the matters set forth herein, (iii) require the Debtor and any proposed assignee to show adequate assurance of future performance of the Lease, as assumed, or as assumed and assigned by, among other things, requiring not only cures as aforesaid but also proof that the indemnity and insurance

[Remainder of page intentionally left blank]

FIRM:24571488v2

obligations of the Tenant under the Lease are now and will, in respect of any assignee that is chosen as the highest and best bidder, be met, and (iv) grant such other and further relief as is just and proper.

Dated: January 31, 2014

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

By: /s/ Wendy G. Marcari
  Wendy G. Marcari, Esq.
  250 Park Avenue
  New York, New York 10177
  (212) 351-3747
  wmarcari@ebglaw.com
  *Counsel to Royal Charter Properties, Inc., Landlord*

OF COUNSEL:

David B. Tatge, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-1875
dtatge@ebglaw.com

FIRM:24571488v2